## MATLACK COAL & IRON CORPORATION v. NEW YORK QUEBRACHO EXTRACT CO.

Circuit Court of Appeals, Second Circuit.
January 7, 1929.

No. 80.

276

Haight, Smith, Griffin & Deming, of New York City (Stanley W. Schaefer, of New York City, of counsel), for libelant.

Haaren & Barrett, of New York City, for respondent.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). ▪ If the libelant's claim had been made up of several items arising upon the breach of a single promise, of which the respondent recognized some and repudiated others, a payment of those conceded would have been good consideration for the discharge of the whole claim on that breach. Baird v. U. S., 96 U. S. 430, 24 L. Ed. 703; Chicago, M. & St. P. R. Co. v. Clark, 178 U. S. 353, 20 S. Ct. 924, 44 L. Ed. 1099; City of San Juan v. Porto Rico, 195 U. S. 510, 25 S. Ct. 108, 49 L. Ed. 299, 1 Ann. Cas. 796; Nassoiy v. Tomlinson, 148 N. Y. 326, 42 N. E. 715, 51 Am. St. Rep. 695. But, when there are two claims arising upon separate promises, though in the same contract, payment of the amount concededly due upon one will not be a good consideration for the release of damages upon breach of the other. Fire Insurance Ass'n v. Wickham, 141 U. S. 564, 577, 12 S. Ct. 84, 35 L. Ed. 860; Williston on Contracts, § 129. The situation is plain when two claims arise under separate contracts, since it cannot be regarded as a detriment to pay what is concededly due under a promise which can be separately enforced. Keene v. Gauen, 22 F. (2d) 723 (C. C. A. 5). The contrary is also

plain, when the payment is a part of what is due, though concededly due, under a single promise, since the promisor cannot be said to be under a separate obligation to pay the conceded part. Now it is true that ordinarily one must sue upon all existing breaches of a contract, and the reasoning of the second illustration has at times been extended to such a case. Yet the requirement of including all breaches in a single suit is only to prevent unreasonable litigation, and the promisor is under a separate obligation in respect of each promise. To pay the sum concededly due under one is not, therefore, to incur a detriment not already imposed upon him. We accept the analysis of Professor Williston, loc. cit.

In Chicago, M. & St. P. R. Co. v. Clark, supra, the railroad owed a balance on a general contract, from which it deducted $40,000 as penalties and about $10,000 for material furnished by itself. Clark had done work, in addition to that specified, amounting to about $34,000 which the railroad included in its payment. The amount claimed under the original contract was apparently not in dispute, and part of the opinion seems to assume that payment of part of it would be a good consideration for a release of the whole, but it concludes (pages 370, 371 of 178 U. S. [20 S. Ct. 931]) by finding that payment for the added work was enough to support the release, because the amount had never been liquidated or conceded to be due except by the payment itself. Fire Ins. Ass'n v. Wickham, supra, was quoted with approval and we cannot suppose that it was overruled. Fuller v. Kemp, 138 N. Y. 231, 33 N. E. 1034, 20 L. R. A. 785, seems on the facts to be contrary to the doctrine as we understand it, but it is doubtful whether it is still law in New York. Eames Vacuum Brake Co. v. Prosser, 157 N. Y. 289, 51 N. E. 986. In the case at bar the payment was of hire due under a separate promise from that to accept delivery, and the amount was not in dispute. There was, therefore, no consideration for the release of damages for the breach, assuming that the documents were intended to have that result, which is somewhat doubtful. We think that there was no accord and satisfaction.

That there was a breach is beyond question; the respondent was obliged to receive not less than 600 tons a day from the ship's tackles, and in four working days received only 927 tons. The expenses cast upon the ship in caring for the cargo thus left on its hands may be recovered. United States v. Sugarland Industries (The Lake Fairlee)

296 F. 913, 915 (C. C. A. 5). The amount of these damages is more difficult to ascertain. Both sides agree, and must agree, that the charterer was not obliged to receive out of working hours, or on Sundays and holidays, and it does not certainly appear how much the ship discharged during the four working days; that is, the 24th, 25th, 26th, and 28th, or would have discharged, had the charterer done its duty. The damages are limited to the cost of piling so much of the cargo as the charterer should have taken. Moreover, excessive tiering was made necessary by the unusual speed used, and the whole cost of this is not on the charterer's account, but only so much as would have been necessary at normal speed.

The ship took 5½ days to unlade about 5,000 tons, and the average for working hours would have been less than 500 tons, if the rate was the same, day and night. The commissioner found that 3,519 tons were discharged on the Brooklyn pier in 308 gang hours, or at a rate of about 11.4 tons per hour. In an 11-hour day, four gangs at the four hatches would have discharged about 500 tons. This calculation probably is wrong, in omitting the dinner hours; but if these be deducted, and a 10-hour day assumed, the result is not substantially different. This was a very slow discharge compared with that at Greenpoint, which was about 800 tons a day, the estimate made by Murphy. It was also slow compared with 1,200 tons discharged in the first 24 hours, during which no work was done on Sunday night after 9 p. m. We can only conclude that the rate was slowed down by the congestion. It is, however, impossible to attribute this altogether to the charterer's default, because the night and holiday work contributed to the delays. Thus it is impossible to ascertain just what would have been the rate, if the charterer had fully performed, but if the work proceeded as it did. Recognizing that any finding is uncertain, we find that the nearest approximation is to assume that, had the charterer properly assisted, an average of 600 tons could have been discharged on each of the four days when it was bound to receive.

Therefore the charterer was responsible for the removal of 2,400 tons during the four days in question, and is chargeable with 1,473 tons. The evidence is not very clear as to what would have been the cost of piling this, as it would have had to be piled, had the discharge been only during working hours, and the charterer had nevertheless been as slack as it was. La Blanc says that the cost of piling to "normal" height was 50 cents a ton,

which we think the only reliable evidence in the case. We fix the damages at $736.50, to which must be added 10 per cent. and 13¼ per cent., or $917.49 in all.

The libelant insists that the respondent, by deducting the dispatch money, became liable for all the added expenses of the high speed used. This is plainly unsound. The dispatch money was in rebate of the hire, since the ship was released for her business so much the earlier. While the charterer benefited, so did she, and the use and the hire are to be treated as offsetting each other. The fact that for her own purposes she saw fit to get her release at a high added cost imposed no obligation on the charterer; in accepting the dispatch money it took nothing but what the contract gave it, and became in no sense party to the gratuitous outlay of the ship.

The delays in the prosecution of the case have been such as to forbid full allowance of interest. The interlocutory decree was entered on November 1, 1922; the cause was brought on before the commissioner on August 19, 1924; his report was filed in December, 1926; and the final decree was entered on January 28, 1927. Three years will be deducted from the full period of interest.

Decree modified, by allowing $917.49, with interest from March 15, 1923. No costs on the appeal.