**UNITED FRUIT CO. v. UNITED STATES.**

No. 4534.

United States Court of Appeals
First Circuit.

Jan. 26, 1951.

Seymour P. Edgerton, Boston, Mass., (John J. Ryan, Jr., and Bingham, Dana & Gould, all of Boston, Mass., with him on brief), for appellant.

Patrick F. Cooney, Atty., Department of Justice, Washington, D. C. (H. G. Morison, Asst. Atty. Gen., George F. Garrity, U. S. Atty., Boston, Mass., J. Frank Staley, Sp. Asst. to the Atty. Gen., and Edward O. Gourdin, Asst. U. S. Atty., Boston, Mass., with him on brief), for appellee.

MAGRUDER, Chief Judge.

United Fruit Company, chartered owner of the S.S. Esparta, filed in the court below a libel in admiralty against the United States as bareboat charterer of the said vessel, to recover damages for the alleged failure of the United States to perform certain redelivery obligations. The district court ordered that the libel be dismissed, upon the sole ground that the asserted cause of action was barred by the terms of a release contained in a so-called "Clean Form Redelivery Certificate" executed by an official of United Fruit Company and by the War Shipping Administration on behalf of the United States.

On September 1, 1945, pursuant to telegraphic requisition, the Esparta was delivered by United Fruit Company to the United States, acting through the Administrator, War Shipping Administration. A few weeks later the Company and the United States entered into a written char-

ter party (Contract No. WSA–10907) on Standard Government Warshipdemise (Rev.) Form No. 103 (Rev.) 4/4/44. The parties executed Part I of this charter party, which incorporated by reference Part II, as printed in 9 F.R. 3801–3806.

Clause 6A of Part II provided that, immediately before redelivery, "the Charterer, at its own expense and on its time, shall restore the Vessel to at least as good condition and class as upon delivery to the Charterer under this Charter, ordinary wear and tear excepted * * *." This obligation was couched in general terms; and of course the specific items of repair or restoration which might be required in fulfillment of the charterer's obligation could well be a matter of doubt, dispute, and negotiated compromise. Clause 6B set up a procedure for determining all outstanding disputes in regard thereto and for performance of the government's obligations in full before redelivery, the vessel meanwhile remaining on charter hire. There was to be a joint survey by representatives of the parties, any unresolved disputes to be finally determined by a surveyor appointed by the American Bureau of Shipping; or in the alternative the survey might be conducted by a single surveyor satisfactory to both parties. It was provided that the restoration obligations of the charterer would be discharged by compliance with the recommendations of the joint surveyors, or of the single surveyor, as the case might be.

On October 29, 1945, the Maintenance and Repair Organization of the War Shipping Administration issued Bulletin No. 18, later modified on November 12, 1945, by Supplement 1 thereto, under which the redelivery provisions of the charter party were changed (so far as those changes were accepted by the owner, as was the case here). Under this new procedure, promptly after receiving notification that a vessel scheduled for redelivery had arrived at a shipyard for restoration, a representative of the owner was to prepare a list of specifications of the restoration work which he deemed to be the government's responsibility under the charter. Representatives of the owner and of the government were then to survey jointly each item of work called for in such specifications, attempting to reach agreement so far as possible upon the items of restoration properly chargeable to government account. Supplement 1 of Bulletin No. 18 provided as follows:

"In order to avoid delays in completing restoration work and redelivering vessels to their owners because of disputes in the field, the decisions of the Local Managers [of the Division of Maintenance and Repair, War Shipping Administration] with respect to disputed items are to be considered final during progress of the redelivery survey and/or accomplishment of work for account of the War Shipping Administration, pending final redelivery settlements.

"Items on which agreements with respect to the War Shipping Administration's responsibility cannot be reached should be awarded by and performed for account of the owner and a claim for reimbursement of the cost thereof filed by the owner with the Division of Redelivery of Chartered Vessels. Local Managers shall, and owners' representatives may, state the reasons for disputes on each item in the redelivery specifications or surveys, also the final disposition of such disputed items."

Early in June, 1946, United Fruit Company was notified by the government that the Esparta was soon to be redelivered to the owner and would proceed to a shipyard at Mobile, Alabama, for restoration work prior to redelivery. The vessel arrived at Mobile on June 25, and went into dry dock on the 27th. In accordance with Bulletin No. 18 and Supplement 1 thereto, local representatives of the owner prepared a list of specifications of restoration work which they thought should be done by the government. The list was screened by Mr. L. H. Bennett, Local Manager at Mobile of the Division of Maintenance and Repair, War Shipping Administration. Bennett accepted some of the items as properly for government account and disallowed the others. A Mobile representative of the Fruit Company reported this determination to Mr. Joseph A. Marquette, then Assistant Manager of Steamships & Domestic Pier Operations, Southern Divi-

sion, United Fruit Company, at New Orleans, Louisiana. Under date of July 9, 1946, Marquette wrote a letter to Bennett's superior, Mr. R. S. Chapman, Director of the Gulf Coast Branch, Division of Maintenance and Repair, War Shipping Administration, whose office was also in New Orleans. In this letter Marquette conceded that five disallowed items were properly for owner's account, but protested the disallowance of the remainder and asked Chapman to review the same. There is some doubt in the record whether Chapman actually received this letter. But this is of no moment, for it is unquestioned that at or about this time Marquette had numerous conversations with Chapman, who thoroughly understood that the owner had not yielded its claim that the government should recognize its responsibility for the remainder of the disallowed items. Upon review of the items in question, Chapman backed up the determinations of his subordinate Bennett and informed Marquette that the only recourse of the owner, under Bulletin 18 and Supplement 1, was to file a claim for reimbursement of the cost of the disallowed items with the Division of Redelivery of Chartered Vessels, War Shipping Administration, in Washington. Marquette continued to correspond with Chapman's office on the matter, and was informed by Chapman's assistant by letter dated November 5, 1946, and again by letter dated December 21, 1946, that the matter was out of the hands of the Division of Maintenance and Repair, and that under the accepted procedure the owner should present any outstanding claims to the Division of Redelivery of Chartered Vessels.

Meanwhile, the shipbuilder at Mobile had proceeded with the restoration work on the Esparta, performing those items for government account which had been accepted by Messrs. Bennett and Chapman as government responsibility, and performing the disallowed items for the owner's account, as provided in Supplement 1. After completion of the work the vessel was redelivered to the owner on July 23, 1946.

On July 9, 1946, Mr. Paul A. Sullivan, Director, Operating Contracts Division, War Shipping Administration, whose office was in Washington, had by telemeter instructed his subordinate, Mr. William G. Yung, Operations Supervisor in New Orleans, as follows: "SS Esparta ready for redelivery at Mobile upon completion of restorations about July 19. Issue Clean Redelivery Certificates." As sometimes happened in the press of business, Yung did not get around to preparing the Redelivery Certificate until several days after the redelivery had actually occurred. Under date of August 7, 1946, Yung addressed a brief note to United Fruit Company at New Orleans, attention of Mr. MacGregor Bulloch, stating merely that there were enclosed an original and eight copies of a certificate covering redelivery of the Esparta at Mobile on July 23, 1946, and requesting that the certificate be signed and returned. At this time Yung had no knowledge of any dispute between the government and the owner relative to the redelivery obligations of the government; nor was there anything in the office records of Yung's particular Division in New Orleans indicating the pendency of any such dispute. Mr. Bulloch, to whose attention this letter of August 7 was directed, was at that time Manager of Steamships & Domestic Pier Operations, Southern Division, United Fruit Company, at New Orleans. But he was then much preoccupied with details of his impending transfer to another position, his Assistant Manager Marquette being slated to be his successor. On August 8 the Chief Clerk laid before Bulloch Yung's disarmingly routine letter, with the accompanying Redelivery Certificate. Without calling for the office files on the Esparta, or consulting Marquette, who he knew had been handling the owner's interest in the restoration work, Bulloch signed the Redelivery Certificate, realizing that the document was more than a mere receipt for the vessel but purported, according to its terms, to be a release of all claims of the owner under the charter party with respect to restoration and repairs. The text of this document is set

forth in the footnote.[1] The district court found, quite properly on the evidence: "Undoubtedly the release was executed by Bulloch in the mistaken belief that his company no longer had any outstanding unsettled claim against the United States."

In the court below, appellant sought to show that the release had been executed due to a mutual mistake; that Yung, in the absence of information to the contrary, had assumed that there was no outstanding dispute between the parties, else he would not have executed the Clean Form Redelivery Certificate and sent it to Bulloch for signature. As to this, the district court found otherwise. It found that Yung would have acted as he did even if he had known, what officials in the WSA Division of Maintenance and Repair knew well enough, namely, that United Fruit Company was still maintaining that the government had not fulfilled all of its obligations under the charter party. The finding was that Yung "merely followed what was the routine policy of the War Shipping Administration of presenting a clean form certificate to an owner who had outstanding claims against the United States, with the hope that the owner would sign the release and thereby abandon its claims, but with the expectation that if the owner seriously intended to press its claims it would protect its rights by refusing to execute a certificate embodying a release. The action of the agents of the United States was motivated by the hope of securing an abandonment of libelant's claims and not by a mistaken belief that they had already been settled or relinquished." Before us, appellant has challenged this finding on the evidence, but in the view we take we may accept the finding and assume, for present purposes, that the execution of the release was not induced by a mutual mistake.

As a matter of law, the district court ruled (1) that the release was supported by sufficient consideration, and (2) that there was no equitable ground for relieving United Fruit Company from the binding effect of the release, there being no fraud, misrepresentation, duress, or mutual mistake. It is clear from the above recital of the evidence that when Yung mailed the Clean Form Redelivery Certificate to United Fruit Company for signature he was not aware that Bulloch was laboring under the mistake of thinking that the Company no longer had any oustanding claims against the United States; hence we do not have the unconscionable situation where one party takes advantage of the known unilateral mistake of the other to induce him to execute a release.

It is our conclusion that the release was a nullity for lack of consideration; that even if the gratuitous release would otherwise have been binding, the United States could not, in equity and good conscience, retain the benefit or advantage thereby unwittingly conferred upon it by United Fruit

---

1. CLEAN FORM REDELIVERY CERTIFICATE
WAR SHIPPING ADMINISTRATION.
Date: July 23, 1946
THIS IS TO CERTIFY THAT THE S.S. "ESPARTA" under Bareboat Charter (Contract WSA–10907, dated September 1, 1945 was on the 23rd day of July 1946, at 12:00 Midnight Central Standard Time, redelivered at the Port of Mobile, Alabama by the UNITED STATES OF AMERICA, Charterers, to UNITED FRUIT COMPANY Chartered Owners, having on board fuel, water, stores and equipment as per inventories taken on the date of redelivery.

It is further agreed that the execution of this certificate shall operate as a release by UNITED FRUIT COMPANY Chartered Owners, of all claims of whatsoever kind or nature which it now has or may have against the Charterer arising out of Charterer's obligations under the Charter or any amendments thereof or any indemnity agreements made in connection therewith or insurance issued pursuant thereto to perform removals, restoration, repairs or work with respect to the vessel excluding (a) claims for hire payable or loss of time involved during or until completion of any such removals, restoration, repairs or work, and (b) the adjustment of inventories.

UNITED STATES OF AMERICA,
By: GRANVILLE CONWAY,
Administrator,
WAR SHIPPING ADMINISTRATION.
By: (s) W. G. YUNG,
Operations Supervisor.
UNITED FRUIT COMPANY,
Chartered Owners
By: (s) MacG. BULLOCH.

Company acting under the unilateral mistake of Bulloch, the United States not having changed its position in reliance on the release in such a way as to make it inequitable now to rescind the release.

This is a suit on a maritime contract, and the substantive law to be applied is the general maritime law as accepted in the United States, the ultimate expositor, of course, being the Supreme Court of the United States. See Jansson v. Swedish American Line, 1 Cir., 1950, 185 F.2d 212. In the absence of any peculiar body of doctrine to be derived from the ancient sources of the general maritime law regarding the efficacy of releases, we suppose that the Supreme Court, in formulating the applicable rules, would be influenced by common law notions as to the necessity for consideration to support a release not under seal. Indeed, the government does not suggest otherwise; and the district court in its discussion of this branch of the case cites as authorities only Williston on Contracts and the American Law Institute Restatement of Contracts. In Matlack Coal & Iron Corp. v. New York Quebracho Extract Co., 2 Cir., 1929, 30 F.2d 275, and Moore & McCormack Co., Inc. v. Valley Camp Coal Co., 4 Cir., 1930, 37 F.2d 308, both of which were suits in admiralty on maritime contracts, defenses of accord and satisfaction or release were rejected for lack of consideration as determined by familiar common law criteria. To the same effect see Fire Insurance Association v. Wickham, 1891, 141 U.S. 564, 579, 12 S.Ct. 84, 35 L.Ed. 860, an action at law on a maritime contract, in which case the substantive law to be applied was presumably the general maritime law as if a libel had been filed in admiralty. See Jansson v. Swedish American Line, supra.

■ Tested by common law criteria, it seems to us plain that the release here in question was unsupported by consideration. The specific items of repair required in fulfillment of the charterer's general redelivery obligation might be a matter of *bona fide* dispute, as here. Therefore if the government had offered to perform certain items on the owner's list of specifications, in consideration of a release by the owner of all outstanding claims, the performance by the government of such items of repair might well have been good consideration for the release. See Chicago, M. & St. P. Ry. Co. v. Clark, 1900, 178 U.S. 353, 367, 20 S.Ct. 924, 44 L.Ed. 1099; Matlack Coal & Iron Corp. v. New York Quebracho Extract Co., supra; Williston on Contracts (Rev. ed. 1936) § 129. But "nothing can be treated as a consideration that is not intended as such by the parties." Fire Insurance Association v. Wickham, supra, 141 U. S. at page 579, 12 S.Ct. at page 88, 35 L.Ed. 860. The restoration work which was done here for government account was not "bargained for and given in exchange" for the release. Restatement, Contracts § 75. Quite the contrary; it was the explicit purpose of the procedure outlined in Bulletin No. 18 and Supplement 1 to speed up redelivery without prejudice to any claim by the owner that suggested items of repair which the government's representatives had disallowed should properly have been charged to government account under the charter party. When Bulloch signed the Clean Form Redelivery Certificate, all the items of repair or restoration which either party had thought ought to be done under the terms of the charter party had been completed and the ship had already been redelivered two weeks before; and there is no doubt that United Fruit Company up to that time had maintained intact its claim that the government should reimburse it for some of the items which had been performed on owner's account. No provision of the charter party required the owner to execute a release, or a receipt for the redelivered vessel, or a closing document of any kind. The execution of the release by Bulloch was not the culmination of a bargaining transaction between the parties. It was a purely gratuitous signing away of claims which the Fruit Company had against the United States.

■ It may be that the law should afford a method whereby a claimant, with

full knowledge of the facts, might bind himself by a confessedly gratuitous release. At common law, affixing a seal to the document accomplished this result. Cairo, T. & S. R. Co. v. United States, 1925, 267 U.S. 350, 45 S.Ct. 247, 69 L.Ed. 651. It is stated in American Law Institute Restatement of Contracts, § 402, Comment *g:* "In most of the United States, legislation has deprived a seal of the efficacy that it had at common law, and in consequence in many States a writing that purports to discharge a person subject to a duty is invalid unless supported by consideration. In a few States a formal writing or receipt in full unsupported by consideration is with or without a statute given the effect that a sealed release had at common law." See also Williston on Contracts §§ 218–219A, 1822. No legislation by Congress in the field of the general maritime law has undertaken to deprive the seal of its efficacy, and presumably within that field a claim may be gratuitously extinguished by a release under seal. But we have found no indication in the decisions of the Supreme Court, or in the cases in the lower federal courts, that an unsealed document, like the Clean Form Redelivery Certificate in the present case, would be held legally operative as a release in the absence of consideration.

However, if it be assumed that the gratuitous release here was *prima facie* binding on United Fruit Company, still the government's defense would fail. A court of admiralty, in cases within its jurisdiction, proceeds upon equitable principles; and if a release is pleaded in defense against a libel in admiralty on a maritime contract, the admiralty court has power to disallow such a defense where under the circumstances the libelant would be entitled to relief by way of rescission or reformation of the release under accepted equitable principles. Rice v. Charles Dreifus Co., 2 Cir., 1938, 96 F.2d 80; Swift & Company Packers v. Compania Colombiana Del Caribe, S.A., 1950, 339 U.S. 684, 70 S.Ct. 861. It is well settled as a general proposition that where a benefit has

been gratuitously bestowed because of a mistake, the donee not having changed his position in reliance thereon, the donor may have rescission of the transaction; and unilateral mistake on the part of the donor is enough, the mistake need not be mutual. See Williston on Contracts §§ 1556, 1573; Restatement, Restitution §§ 26, 39, 49. See also Union National Bank of Chicago v. McKey, 7 Cir., 1900, 102 F. 662; Batto v. Westmoreland Realty Co., Inc., 1930, 231 App.Div. 103, 246 N.Y.S. 498. A rescission will not be denied in such cases merely because the unilateral mistake may have been attributable in some sense to lack of care or diligence. Restatement, Restitution § 59.

In the case at bar the equities are strongly in favor of relieving United Fruit Company from the effect of the release. Under the terms of the charter party it could have insisted that all outstanding disagreements be settled according to the procedure in clause 6B of Part II prior to redelivery of the vessel, the government meanwhile remaining under a continuing obligation to pay the stipulated charter hire. Instead, it acquiesced in a speedy redelivery, under the modified procedure set forth in Bulletin No. 18 and Supplement 1 thereto, whereby it was distinctly understood that acceptance of redelivery was without prejudice to any claims which the owner might have against the charterer with respect to the cost of restoration or repair. On the facts here disclosed, the United States, in equity and good conscience, should not be allowed to retain the benefit of the release, for which it gave no consideration, and which United Fruit Company mistakenly executed due to a slip-up in Bulloch's office, there having been no intention on the owner's part to discharge these particular claims against the charterer.

The order of the District Court is vacated and the case is remanded to the District Court for further proceedings not inconsistent with this opinion; the appellant recovers costs on appeal.