HOME SAVINGS OF AMERICA,
F.S.B., and H.F. Ahmanson
& Co., Plaintiffs,

v.

The UNITED STATES of
America, Defendant.

No. 92–620C.

United States Court of Federal Claims.

Feb. 21, 2006.

Michael A. Carvin, Washington, D.C., argued for plaintiffs. With him on the briefs were Debra L. Satinoff, Washington, D.C.; and Steven S. Rosenthal, Jeffery A. Tomasevich, and Douglas A. Tucker, each of Washington, D.C., as of counsel.

Sameer Yerawadekar, Trial Attorney, Commercial Litigation Branch, United States Department of Justice, argued for defendant. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, John N. Kane, Jr., Trial Attorney, and Jerome A. Madden, Trial Attorney, as of counsel.

*OPINION*

BRUGGINK, Judge.

Pending in this *Winstar*-related case [1] are plaintiffs' motion for summary judgment and defendant's cross-motion for summary judgment. Our prior judgment was partially affirmed and partially vacated and remanded by the Federal Circuit. We now review the vacated and remanded issue which relates to the Ohio-insured thrifts.[2] The sole issue remaining on liability is whether consideration supported government promises made in connection with those thrifts. We must also consider what damages accompany any breach. For the reasons set forth below, plaintiffs' motion is granted and defendant's motion is denied.

---

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. We issued an opinion that modified our prior judgment to recognize that all of those issues

affirmed by the Federal Circuit were outside the remand and effectively severed by the Federal Circuit. *See Home Sav. of Am., F.S.B. v. United States*, 69 Fed.Cl. 187 (2005).

## BACKGROUND

The facts have been addressed at length in our previous opinions as well as that of the Federal Circuit. *See Home Sav. of Am., F.S.B. v. United States,* 399 F.3d 1341 (Fed. Cir.2005) ("*Home IV*"); *Home Sav. of Am., F.S.B. v. United States,* 57 Fed.Cl. 694 (2003) ("*Home III*"); *Home Sav. of Am., F.S.B. v. United States,* 51 Fed.Cl. 487 (2002) ("*Home II*"); *Home Sav. of Am., F.S.B. v. United States,* 50 Fed.Cl. 427 (2001) ("*Home I*"). For purposes of clarity, we will give a short overview of the general facts and then address, in detail, the one transaction still at issue. All facts are drawn from the parties' proposed findings of uncontroverted fact as well as prior opinions.

Home Savings of America, F.S.B. ("Home Savings"), located in Los Angeles, California, was a wholly-owned subsidiary of H.F. Ahmanson and Company ("Ahmanson") (both entities referred to hereinafter singularly as "Home") at the time of the transactions in question. Home's conservative banking practices assisted the entity in successfully weathering the savings and loan crisis of the 1980s. While other thrifts all over the country were failing, Home remained a healthy institution. The federal regulatory agencies which stood to suffer most if other institutions failed sought out thrifts such as Home to acquire troubled institutions.

Home purchased seventeen troubled thrifts with FSLIC and FHLBB approval and assistance. These purchases break down into five transactions: 1) the Florida/Missouri transaction; 2) the Illinois/Texas transaction; 3) the Century transaction; 4) the Ohio transaction; and 5) the Bowery Savings Bank transaction. The questions of liability and damages have been resolved in regard to all but the Ohio transaction. Even with respect to that transaction, however, certain facts are conclusively established by the Federal Circuit affirmance.

### The Ohio–Insured Thrifts

In the spring of 1985, public confidence in state institutions insured by the Ohio Deposit Guaranty Fund ("ODGF") faltered and caused the fund to fail. By order of the governor, sixty-nine Ohio-chartered thrifts were closed. The Federal Home Loan Bank ("FHLBank") of Cincinnati and the Federal Home Loan Bank Board ("FHLBB") worked with Ohio banking officials in an effort to bring the ODGF-insured thrifts under the protection of federal insurance through application for federal insurance or merger with a healthy federally-insured entity.

Ohio representatives contacted Home in an effort to convince it to acquire one or more of the Ohio-insured institutions. Home and state officials collaborated to determine which associations Home would acquire. Home decided on the following institutions: American Savings Bank of Worthington, Ohio ("American"); Savings One Association of Gahanna, Ohio ("Savings One"); Oxford Savings Association of Oxford, Ohio ("Oxford"); and Permanent Savings and Loan Association of Hamilton, Ohio ("Permanent"). None were then federally insured.

Home and Ohio negotiators then contacted the FHLBank of Cincinnati. That organization expressed reluctance to approve an interstate transaction which did not involve a problem institution insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). In fact, Norman Raiden, General Counsel of FHLBB, advised Home that takeover of any Ohio-chartered institution which required any FHLBB or FSLIC consent or approval would also require the takeover of a troubled FSLIC-insured Ohio institution. Federal regulators thus linked the acquisition of state-insured thrifts to acquisition of at least one federally-insured thrift. The FHLBank of Cincinnati suggested five distressed Ohio-based FSLIC-insured institutions as candidates. After investigation, Home chose to pursue the acquisition of Home Federal Savings and Loan Association of Marion, Ohio ("Home Federal").

Home Federal was a federally insured institution that was experiencing a long trend of losses and erosion of net worth. The FHLBank of Cincinnati projected that Home Federal would be insolvent on a regulatory basis by midsummer 1985. The Analysis and Evaluation Division ("EAD") of the Office of Federal Savings and Loan Insurance Corporation ("OFSLIC") estimated that Home Federal's liabilities exceeded its assets by

$38.2 million or more and that it would cost the FSLIC $35.5 million to liquidate Home Federal. Home Federal was provided a list of 16 potential acquirers, but its attempts to find a merger partner were fruitless. The Supervisory Agent of FHLBB then contacted another 18 healthy thrifts, none of which had an interest in acquiring Home Federal. Home, therefore, was the first healthy institution to show any serious interest.

Home determined that FSLIC assistance would be necessary for the acquisition of Home Federal. Home and the FSLIC settled on a ten year $200 million "pass-through" loan from FSLIC. FSLIC would borrow the money from the FHLBank of Cincinnati. The OFSLIC estimated that FSLIC would gain $1.7 million on the transaction.

With respect to the Ohio-insured thrifts, the OFSLIC realized, as reflected in a memorandum to the FHLBB, that the "unresolved status" of the ODGF banks had the potential to further diminish public confidence in "financial institutions, including those federally insured." App. to Pl. Mot. for Sum. J. ("Pl.App.") at 53. Taking this into consideration, the OFSLIC recommended that the Bank Board approve the FSLIC-assisted acquisition of Home Federal and the unassisted acquisition of the four Ohio-chartered institutions by Home.

On May 21, 1985, one day before the execution of all but one of the merger agreements, the FHLBB issued Resolution 85–393 approving "the applications for bank membership and insurance of accounts of New American, Permanent, and Oxford, ... [and] Savings One." Pl.App. at 83. The Resolution approved all of the merger transactions and recognized the importance of these transactions to prevent the failure of these institutions. Pl.App. at 93. It also required Ahmanson to maintain the net worth of Home Savings at a certain amount, and, if necessary, "infuse sufficient additional equity capital" to maintain compliance. Pl.App. at 91.

On May 22, 1985, Home acquired three of the four agreed upon ODGF institutions: Permanent, Oxford, and American, as well as Home Federal. *Home I,* 50 Fed.Cl. at 433. The acquisitions were effected through four merger agreements. Permanent was converted into a federally-insured institution and named "New Permanent." As evidenced in New Permanent's merger agreement, New Permanent was the resulting entity from a merger with Home Federal after its merger with Oxford:

> [I]mmediately prior to the consummation of the Merger, (i) Permanent will have been converted to New Permanent, a federally chartered stock savings and loan association the accounts of which are insured by the FSLIC; (ii) Oxford will have merged with and into Home Federal, with Home Federal as the resulting association; and (iii) Home Federal will have merged with and into New Permanent, with New Permanent as the resulting association.

Pl.App. at 23. New Permanent then merged with Home Savings. Prior to the next merger agreement, American was first converted into "New American," "an interim Ohio building and loan association wholly-owned by Modern [Finance Company]." Pl.App. at 37. New American was then immediately merged into Home Savings. Finally, on June 20, 1985, Savings One merged into Home Savings.

The effect of these mergers and acquisitions was that Home acquired all of the Ohio-insured thrifts. Each of the Ohio-insured thrift merger agreements contained a clause referring to the Assistance Agreement between Home and FSLIC: "In connection with the acquisition of HOME FEDERAL, the FSLIC has agreed to provide assistance on the terms and conditions set forth in the following agreements (the 'Assistance Agreements'): (i) an ASSISTANCE AGREEMENT between the FSLIC and HOME SAVINGS ...." Pl.App. at 23, 30, 37, 44.

While the Assistance Agreement was built around the acquisition of Home Federal, the agreement thus was also a necessary element of all aspects of the overall transaction, including the acquisition of and mergers with state-insured thrifts. The Assistance Agreement, in turn, discussed Home's reorganization and its acquisition of the four state-insured thrifts. The agreement also contained a clause integrating all contempo-

raneously-issued Bank Board or FSLIC resolutions, including the FHLBB Resolution discussed *supra*, thereby knitting into the overall transaction the following clauses discussing accounting principles:

RESOLVED FURTHER, That in accounting for the Acquisition and the Savings One Acquisition,[3] Home Savings shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified and interpreted by applicable regulations of the Bank Board and the FSLIC; and

RESOLVED FURTHER, That Home Savings shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants, satisfactory to the Principal or other Supervisory Agent of the Bank Board, San Francisco, California ("California Supervisory Agent") and to the Office of Examinations and Supervision, which (i) specifically describes as of the closing date, any intangible assets, including goodwill or the discounts and premiums arising from the Acquisition and the Savings One Acquisition to be recorded on Home Savings' consolidated books; and (ii) substantiates the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discounts and premiums and the related amortization periods and methods . . . .

FHLBB Resolution No. 85–393 at 10–11 (Pl. App. at 90). The net result was that Home acquired supervisory goodwill attributable to previously state-insured thrifts.

The Assistance Agreement was also governed by generally accepted accounting principles ("GAAP") as applied in the savings and loan industry. GAAP as applied in the savings and loan industry allowed entities to utilize supervisory goodwill to meet minimum regulatory standards. *See Home IV*, 399 F.3d at 1350–51.

When the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101–73, 103 Stat. 183, was enacted, Home was forced to phase out its use of this supervisory goodwill and re-

place it with tangible capital. Home filed this action in 1992, alleging that the government breached the transaction contracts by disallowing the use of goodwill and seeking the costs associated with the replacement of supervisory goodwill with tangible capital.

*Procedural History*

In *Home I*, we found that government representatives had the authority to promise plaintiff the use of supervisory goodwill to meet reserve capital requirements for federally-insured thrifts. We also found that the government breached these promises when it limited the use of supervisory goodwill to meet minimum requirements with the enactment of FIRREA. However, we granted partial summary judgment to the government with regard to the Ohio-insured thrifts, holding that the FHLBB did not have statutory authority to contract with Home with regard to counting supervisory goodwill flowing from the purchase of state-insured banks toward minimum capital requirements. *Home I*, 50 Fed.Cl. at 441–42.

Both the government and Home appealed our decision. With respect to plaintiff's cross-appeal, which was directed at our denial of relief with respect to Ohio-insured thrifts, the Federal Circuit held, "we vacate the summary judgment and remand to the Court of Federal Claims for further proceedings regarding the Ohio-insured thrifts." 399 F.3d at 1344. The court explained:

FSLIC and FHLBB did have authority to promise supervisory goodwill with respect to these acquisitions. The statutory grants of authority-one general and one specific-overlap rather than conflict, and here FSLIC and FHLBB had the authority to enter into these contractual arrangements under the general provision, [12 U.S.C.] § 1725(c). The specific grant of authority in § 1729(f) does not implicitly limit § 1725(c)'s general grant of authority. Accordingly, both can and should be given effect. *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). To do otherwise would essentially nullify the grant of general authority in § 1725(c).

---

**3.** The Acquisition was defined as Home's acquisition of American, Permanent, Oxford, and Home

Federal. The Savings One Acquisition referred to Home's acquisition of Savings One.

That general provision was enacted prior to § 1729(f)(2), and there is no indication that Congress intended to nullify it by passing § 1729(f)(2). *See id.* at 549–51, 94 S.Ct. 2474.

*Home IV,* 399 F.3d at 1357.

In *Home I,* when we found that the government did not have the authority to promise the use of supervisory goodwill with state-insured institutions, we did not consider the government's only other remaining defense-an asserted lack of consideration. Now that the Federal Circuit has determined that the requisite authority did exist, we must consider the government's argument that Home did not provide adequate consideration for the promise as well as its challenge to calculation of damages. Home responds that consideration was adequate to create a binding contract. It also seeks a gross-up of damages to account for taxes. In sum, it seeks damages in the amount of $15,906,000 with respect to the four Ohio-insured thrifts.

## DISCUSSION

### I. Standard of review

Summary judgment is appropriate when a party can prove that there is no genuine dispute of the material facts and that the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *Am. Pelagic Fishing Co., v. United States,* 379 F.3d 1363, 1370–71 (Fed.Cir.2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The parties agree that there are no genuine disputes as to any material facts.

### II. Consideration

Plaintiff argues that consideration is sufficient as long as "there is any benefit to the promisor or any detriment to the promisee." *Nebco & Assoc. v. United States,* 23 Cl.Ct. 635, 645 (1991) (citing Restatement (Second) of Contracts §§ 71, 332(5) (1981)). Plaintiff points to the multiple written agreements between Home and the government, specifically FHLBB Resolution 85–393 and the Assistance Agreement, to prove the existence of at least three valuable pieces of consideration given by plaintiff in exchange for the government's promise to allow the use of supervisory goodwill flowing from acquisition of the Ohio-insured thrifts, any one of which would be sufficient consideration.

First, plaintiff points to Home's agreement to acquire the federally-insured thrift, Home Federal. Defendant does not deny the government's receipt of this consideration and plaintiff contends it is adequate consideration to support all government promises made in connection with the other aspects of the agreement. Plaintiff relies on *Corbin on Contracts:* "A single and undivided consideration may be bargained for and given as the agreed equivalent of one promise or of two promises or of many promises." 2 *Corbin on Contracts* § 5.12 at 56; *see also Fla. Keys Aqueduct Auth. v. United States,* 7 Cl.Ct. 297, 299 (1985), *aff'd,* 790 F.2d 95 (Fed.Cir. 1986) (holding that consideration supports the agreement as a whole).

Second, the FHLBB Resolution required Home to maintain the net worth of the surviving entity at a required amount and, if necessary, "infuse sufficient additional equity capital" to maintain future compliance. Plaintiff argues that the Federal Circuit explicitly recognized this as consideration in exchange for the treatment of supervisory goodwill when, in relation to the Ohio transaction, it stated, "Ahmanson promised it would maintain Home's net worth; in exchange, the government promised to provide financial assistance by promising certain accounting treatment for goodwill." *Home IV,* 399 F.3d at 1349. Indeed, the prior damage award, now affirmed, was, in part, based on that portion of the Ohio transaction related to the acquisition of Home Federal.

Finally, plaintiff argues that the government received the benefit of restored public confidence in the Ohio and federal banking systems because of Home's purchase of these five thrifts. Specifically, the FHLBB Resolution draws attention to the need for expeditious treatment of Home's request for approval in order to quickly restore public confidence. The Resolution recognized that the approval of the acquisitions was necessary "to prevent the probable failure of

Home Federal *and the Ohio Thrifts.*" (Emphasis added).

In response, defendant does not question the receipt of these elements of consideration. Instead, it argues that that portion of the Ohio transaction by which it promised to allow plaintiff to use supervisory goodwill derived from the Ohio-insured thrifts was not specifically supported by consideration because it was not offered in exchange for, nor conditioned upon, "any of the benefits that Home says the Government derived *from the contract.*" Def. Opp. at 11 (emphasis original). Defendant explains:

> Never was the Government induced to promise to treat the goodwill from the Ohio-insured thrifts as regulatory capital by anything that Home did. Indeed, Home had wanted to purchase the Ohio-insured thrifts even without *any* forbearance respecting the treatment of their goodwill, before the Federal Government even entered the picture.

Def. Opp. at 14 (emphasis original). Defendant argues that the promise, in effect, simply showed up without provenance in the final agreement. According to defendant, plaintiff fails to point to any particular negotiations concerning supervisory goodwill derived from the Ohio-insured banks.

Plaintiff concedes that it has offered no specific evidence connecting particular negotiations to particular elements of consideration flowing from the government. Plaintiff's response is more basic: no such evidence is needed because all promises from the government are fully supported by any consideration flowing from plaintiffs, irrespective of whether it can be traced chronologically through the negotiation or by matching elements of the agreement. In short, defendant's argument is legally irrelevant. We agree.

We found previously the existence of a contract between Home and the government that included the promise to allow supervisory goodwill with respect to the entire Ohio transaction. The Federal Circuit affirmed that there was a contract and found that the government had authority to make the Ohio-insured supervisory goodwill promise. *Home IV,* 399 F.3d at 1357. It implicitly thereby held that consideration existed to support this promise as well.

In any event, we disagree with the import of the government's argument that the offeree's particular performance "must have been *induced by* the offeror's promise." Def. Opp. at 12 (emphasis original). The cases defendant cites for that proposition, *Ridge Runner Forestry v. Veneman,* 287 F.3d 1058, 1061 (Fed.Cir.2002); *GenCorp., Inc. v. Am. Int'l Underwriters,* 178 F.3d 804, 812–13 (6th Cir. 1999); *United Fruit Co. v. United States,* 186 F.2d 890, 895–96 (1st Cir.1951);[4] *Estate of Bogley v. United States,* 206 Ct.Cl. 695, 514 F.2d 1027, 1032 (1975), do not hold that each promise in a contract must be bargained for with separate, distinct, and explicit consideration.[5] Instead, we find the applicable rule to be that one party can offer one consideration in exchange for one or many promises. *See 2 Corbin on Contracts* § 5.12 at 56.

The written agreements between the parties here make it clear that each promise received proper consideration. It is not necessary, therefore, to parse the written agreement or the negotiating leading up to it to

---

**4.** During oral argument, defendant relied on *United Fruit* for the proposition that a promise cannot be consideration for another promise if it was not intended by the party as consideration for that specific promise, even if other consideration exists. 186 F.2d at 895. The facts of that case are distinguishable, however. In *United Fruit,* neither the individual preparing the release agreement at issue nor the individual approving and signing the release were aware that claims still existed against the United States that should not be released. *Id.* at 893. Because the parties did not realize those claims still existed, the releasing party could not intend the release to be consideration and the United States could

not retain the benefit unwittingly conferred. *Id.* at 894–95.

**5.** Defendant also cites *Fire Ins. Ass'n v. Wickham,* 141 U.S. 564, 579–80, 12 S.Ct. 84, 35 L.Ed. 860 (1891), for the proposition that the presence of a promise that could be consideration, but is not included in the written contract, does not necessarily make it consideration for the promise in the contract. The action must have been offered by one party and accepted by the other for it to constitute valid consideration. *Id.* In the case at hand, however, the relevant promises made by both sides are contained in agreed upon written documents.

determine that each promise made in the writing was separately bargained for.

It became apparent during oral argument that the government's insistence that we demand proof that each element of the agreement was supported by separate consideration agreed upon during negotiations flows out of a mistake in our opinion in *Home II*, 51 Fed.Cl. at 498. In finding a contract, we erred in using the words "implied-in-fact" to describe the contract. This implies the use of parol evidence.[6] Defendant, therefore, argues that because we apparently used parol evidence to find the existence of a contract, we must now also look to parol evidence to determine if the use of this supervisory goodwill was specifically bargained for during negotiations. Defendant's point is, if we require plaintiff to point to specific evidence of a negotiation for this promise, we will see that no such parol evidence exists and that this one government promise regarding supervisory goodwill was not separately supported by consideration from plaintiff.

The Federal Circuit pointed out, however, that our use of "implied-in-fact" was a slip in terminology and not necessary to the result. *See Home IV*, 399 F.3d at 1349; *Home II*, 51 Fed.Cl. at 498. We and the Federal Circuit recognize that, although there were multiple components to the contract, and the contract was not merely embodied in the Assistance Agreement, it was indeed an express contract with promises made in writing. Parol evidence was not necessary to come to that conclusion. More importantly, the contract writings are sufficient to establish consideration. We agree with plaintiff that there was sufficient consideration to support all aspects of the agreement. Defendant is therefore liable to plaintiff for Home's costs of replacing supervisory goodwill with tangible capital.

### III. Tax Gross–Up

The parties stipulated that application of the damages model previously used to calculate the damages, affirmed by the Federal Circuit, yields an amount of $9,424,000. This represents the costs plaintiff incurred in replacing the Ohio-insured thrifts' goodwill with tangible capital. While this principle amount is uncontested, defendant challenges plaintiff's request for a tax gross-up of $6,482,000. Defendant argues that this court does not have jurisdiction to review this claim because it is not an element of damages for breach of contract. Defendant argues that allowing a gross-up inhibits Congress's power to tax and therefore violates the unmistakability doctrine.[7]

In our prior decision with respect to damages for the federally-insured thrifts, we allowed a tax gross-up. *See Home III*, 57 Fed.Cl. at 730–31. That ruling was affirmed by the Federal Circuit. *See Home IV*, 399 F.3d at 1355–56. We see no reason for a different result here.

### CONCLUSION

For the reasons stated above, we find the government liable for a breach of contract with respect to plaintiff's inability to use supervisory goodwill flowing from acquisition of the Ohio-insured banks. Plaintiff has proven damages in the amount of $15,906,000. The clerk is directed to enter judgment in that amount. Costs to plaintiffs.

---

**6.** The parol evidence rule is a rule of substantive law "that prohibits the use of external evidence to ... modify the terms of a written agreement 'in instances where the written agreement has been adopted by the parties as an expression of their final understanding.' ... Evidence of the parties' course of dealing constitutes this kind of [prohibited] parol evidence." *Barron Bancshares, Inc. v. Masterson*, 366 F.3d 1360, 1375–1376 (Fed.Cir.2004) (citations omitted).

**7.** The Federal Circuit has characterized the unmistakability doctrine as the proposition that, "absent a clear statement to the contrary, a contract entered into by a private party with the government will not be interpreted to exempt the private party from the operation of a subsequent sovereign act by the government." *Centex Corp. v. United States*, 395 F.3d 1283, 1306–1307 (Fed. Cir.2005).