**HOME SAVINGS OF AMERICA, F.S.B., and H.F. Ahmanson & Co., Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

No. 92–620C.

United States Court of Federal Claims.

May 18, 2001.

Michael A. Carvin, Washington, D.C., argued for plaintiffs. With him on the briefs was Charles J. Cooper, Washington, D.C. Steven S. Rosenthal, Jeffery A. Tomasevich, and Douglas A. Tucker, each of Washington, D.C., of counsel.

Lee M. Straus, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for defendant. With him on the briefs were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Jeanne

E. Davidson, Deputy Director. Jordan A. Thomas, Trial Attorney, of counsel.

### OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related [1] case are plaintiffs' Motion for Partial Summary Judgment as to Liability; defendant's Cross-motion for Summary Judgment; the Motion of Plaintiffs' Coordinating Committee for Leave to File, as *Amicus Curiae,* Memorandum in Support of Response by Plaintiffs to Court's Order of March 7, 2001; and defendant's Partial Motion to Dismiss. Oral argument was held on March 5, 2001. After oral argument, the court requested supplemental briefing. For the reasons set forth below, plaintiffs' Motion for Partial Summary Judgment is granted in part and denied in part, and defendant's Cross–Motion for Summary Judgment is granted in part and denied in part. The Motion of Plaintiffs' Coordinating Committee for Leave to File, as *Amicus Curiae,* Memorandum in Support of Response by Plaintiffs to Court's Order of March 7, 2001 is denied as moot. In accordance with this court's order of February 9, 2000, defendant's Partial Motion to Dismiss remains pending.

### BACKGROUND [2]

This *Winstar*-related case involves five separate transactions in which plaintiffs Home Savings of America, FSB, ("Home Savings") and H.F. Ahmanson & Co. ("Ahmanson") acquired seventeen thrift institu-

tions. Home Savings is a wholly-owned subsidiary of Ahmanson. These transactions occurred between 1981 and 1988. Each transaction was supervised by the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB"), making each of the transactions a supervisory merger. In addition, each transaction was assisted by the FSLIC and approved by the FHLBB. For the sake of simplicity, the court adopts the following nomenclature to identify these five transactions: (1) the Florida/Missouri transaction, (2) the Illinois/Texas transaction, (3) the Century transaction, (4) the Ohio transaction, and (5) the Bowery Savings Bank transaction. At issue in each of these transactions is whether the government made a promise that plaintiffs would be able to include supervisory goodwill [3] in meeting their capital reserve requirements and then breached that promise by limiting the use of supervisory goodwill in meeting those requirements, pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101–73, 103 Stat. 183.

Plaintiffs have withdrawn their breach of contract claim regarding the Bowery Savings Bank transaction. Pls.' Suppl. Reply in Supp. of Pls.' Mot. for Part. Summ. J. at 2.[4] Furthermore, the government had apparently conceded contractual liability regarding the first three of these transactions in light of the liability opinion in *California Federal Bank v. United States,* 39 Fed.Cl. 753 (1997),

---

1. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). All additional citations to *Winstar* in this opinion are to the plurality opinion.

2. Pursuant to the short form summary judgment procedure established by the September 18, 1996, Omnibus Case Management Order governing *Winstar* cases, no proposed findings of fact were filed with these cross-motions for summary judgment. However, as evidenced by the briefs and appendices submitted by the parties, the relevant facts are undisputed. Because the relevant facts are not in dispute, the issues presented here are appropriate for summary judgment.

3. Goodwill, under the purchase method of accounting, is an intangible asset equal to the "excess of the purchase price over the fair value of

all identifiable assets." *Winstar,* 518 U.S. at 848–49, 116 S.Ct. 2432. Supervisory goodwill is goodwill "recognized under the purchase method as the result of an FSLIC-sponsored supervisory merger." *Id.* at 849, 116 S.Ct. 2432. "Thrift regulators let the acquiring institutions count supervisory goodwill toward their reserve requirements under 12 C.F.R. § 563.13 (1981)." *Id.* at 850, 116 S.Ct. 2432.

4. Defendant requests that the court enter summary judgment on plaintiffs' breach of contract claim regarding the Bowery Savings Bank transaction. Reply in Supp. of Def.'s Suppl. Cross-mot. at 2. Plaintiffs have agreed that this is appropriate. Tr. at 108. Accordingly, we direct that summary judgment on contract liability be entered against the plaintiffs in regard to the Bowery Savings Bank transaction.

*aff'd*, 245 F.3d 1342 (Fed.Cir.2001), although it reserved its right to appeal. Def.'s Resp. to Pls.' Reply to the Gov't's Resp. to the Order to Show Cause at 6. At oral argument, however, the government argued that it had not conceded liability and that, even if it had, it was not bound by any concession. The government then proceeded to address the liability issues involved in the first three transactions, in addition to those involved in the Ohio transaction. Plaintiffs argue that the government made a binding concession of liability. However, because we find that plaintiffs prevail on the merits, it is unnecessary to decide whether the government's apparent concession is legally binding.[5] The court, therefore, will state the relevant generally accepted accounting principles ("GAAP") at the time of the Florida/Missouri transaction, the Illinois/Texas transaction, the Century transaction, and the Ohio transaction and then state the relevant facts regarding each of these particular transactions.

### I. GAAP and FHLBB Policy Regarding Supervisory Goodwill

At the time of all four of the transactions at issue here, GAAP and FHLBB policy allowed supervisory mergers to be accounted for using the purchase method of accounting. Purchase method accounting allowed acquirers to treat supervisory goodwill, acquired through a supervisory merger, as an intangible asset. *Winstar*, 518 U.S. at 848–49, 116 S.Ct. 2432.

Although GAAP allowed purchase method accounting to be used in accounting for all four of the transactions under consideration here, the amortization period allowed by GAAP changed during the period of time between the Illinois/Texas transaction in 1982 and the Century transaction in 1984. At the time of the Florida/Missouri and Illinois/Texas transactions, GAAP, as reflected in Accounting Principles Board Opinion No. 17, allowed for goodwill to be amortized over its useful life, not to exceed forty years. *Id.* at 851, 116 S.Ct. 2432. FHLBB policy, as

expressed in Memorandum R–31b, accorded with GAAP at the time of these first two transactions.

In 1983, GAAP's approach to the amortization of goodwill changed with the issuance of Statement of Financial Accounting Standards ("SFAS") 72. SFAS 72 allowed goodwill to be amortized over a period no greater than the estimated remaining life of the long-term interest-bearing assets acquired or, if the combination did not include a significant amount of long-term interest-bearing assets, over a period not exceeding the estimated average remaining life of the existing deposit base acquired. *Id.* at 855, 116 S.Ct. 2432. In transactions of the sort at issue here, this meant that the time period for the accretion of discount[6] would now, under GAAP, equal the time period for the amortization of goodwill. *Id.* Before this change, GAAP allowed the time period for the amortization of goodwill to be significantly longer than the time period for the accretion of discount, thus making a thrift appear more profitable than it actually was. *Id.* at 852–53, 116 S.Ct. 2432.

FHLBB policy regarding the amortization period for goodwill also changed after the Illinois/Texas transaction was completed in January 1982. Subsequent to this date, the FHLBB revised the amortization period downward from 40 years to 30 years, and then to 25 years.

### II. The Florida/Missouri Transaction

Plaintiffs acquired three failing thrifts on December 17, 1981: one Florida institution, Southern Federal Savings and Loan Association of Broward County, and two Missouri institutions, Hamiltonian Federal Savings and Loan and Security Federal Savings and Loan. Also on December 17, 1981, plaintiffs entered into an assistance agreement with the FSLIC in regard to the acquisition ("Florida/Missouri Assistance Agreement"). Section 13 of the Florida/Missouri Assistance Agreement provided:

---

5. For this reason, we deny as moot the Motion of Plaintiffs' Coordinating Committee for Leave to File, as *Amicus Curiae*, Memorandum in Support of Response by Plaintiffs to Court's Order of March 7, 2001.

6. Discount is the difference between a loan's face value and its market value; accretion of discount is the decline over time of the magnitude of the discount. *See Winstar*, 518 U.S. at 852, 116 S.Ct. 2432.

Except as otherwise provided herein, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement or with the applicable Federal Regulations, the Agreement or said Regulations shall govern. For purposes of this section, the accounting principles and the governing regulations shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board or any successor organization of the American Institute of Certified Public Accountants respectively. In case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with said Regulations.

Section 10 of the Florida/Missouri Assistance Agreement, in pertinent part, provided:

Except as otherwise specifically provided, this Agreement shall terminate 5 years following the date of this Agreement above written . . . .

Section 16 of the Florida/Missouri Assistance Agreement integrated into the agreement "any resolution or letters issued contemporaneously herewith by the Federal Home Loan Bank Board." This section integrated FHLBB Resolution 81–803 ("Florida/Missouri Resolution") which contained the following resolve:

RESOLVED FURTHER, That the Bank Board hereby finds that the submission of Home concerning the accounting treatment to be afforded its acquisition of Southern . . . appropriately supports the application of the purchase method of accounting for the acquisition; and that based upon such submission, and the circumstances described therein, the Bank Board hereby determines that it does not object to (1) the amount of any resulting intangible assets being first assigned to the acquired savings deposit base in the amount of .5 percent of the acquired savings balances and .05 percent of the acquired certificate balances, which will have a life of ten (10) years, and (2) any excess being assigned to goodwill and initially amortized, in accordance with generally accepted accounting principles, over forty (40) years, *provided* that Home shall furnish an analysis, accompanied by a concurring opinion from its independent accountant satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision which (a) specifically describes, as of the effective date of the Southern Merger, any premiums or discounts on assets or liabilities, or intangible assets to be recorded as a result of the Southern Merger and (b) substantiates the reasonableness of amounts assigned to any tangible or intangible assets or liabilities and the related amortization periods and methods assigned to such amounts[.]

Home Savings provided the analysis and opinion required by the Florida/Missouri Resolution.

## III. The Illinois/Texas Transaction

Plaintiffs acquired the following failing thrifts on January 15, 1982: Royal Federal Savings and Loan Association of Dallas, Texas; El Centro Federal Savings and Loan Association of Dallas, Texas;[7] and Hyde Park Federal Savings and Loan Association of Chicago, Illinois.[8] Plaintiffs entered into an assistance agreement regarding this acquisition ("Illinois/Texas Assistance Agreement") on January 15, 1982, as well. Section 13 of the Illinois/Texas Assistance Agreement was identical to § 13 of the Florida/Missouri Assistance Agreement, and § 10 of the Illinois/Texas Assistance Agreement was identical to § 10 of the Florida/Missouri Assistance Agreement. Also like the Florida/Missouri Assistance Agreement, the Illi-

---

7. Prior to acquisition by plaintiffs, El Centro had acquired substantially all of the assets and liabilities of Civic Savings and Loan Association of Irving, Texas; Republic of Texas Savings Association of Houston, Texas; and Buffalo Savings and Loan Association of Houston, Texas.

8. Prior to acquisition by plaintiffs, Hyde Park had acquired Reserve Savings and Loan Association of Elmhurst, Illinois, and Palos Savings and Loan Association of Palos Heights, Illinois.

nois/Texas Assistance Agreement contained an integration clause, integrating FHLBB resolutions and letters issued contemporaneously with the Illinois/Texas Assistance Agreement. Excepting the names of the acquired institutions, the FHLBB resolution in this transaction, Resolution 82–29 ("Illinois/Texas Resolution"), contained language identical to that used in the Florida/Missouri Resolution. Home Savings provided the analysis and opinion required by the Illinois/Texas Resolution.

### IV. The Century Transaction

On August 10, 1984, plaintiffs acquired Century Federal Savings and Loan Association of Long Island, a failing New York thrift. On the same day, plaintiffs entered into an assistance agreement regarding this acquisition ("Century Assistance Agreement"). Section 13 of the Century Assistance Agreement provided:

> Except as otherwise provided, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry; except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the CORPORATION, or any resolution or action of the Bank Board approving, or adopted concurrently with, this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolution or action. If there is a conflict between such regulations and the Bank Board's resolution or action, the Bank Board's resolution or action shall govern. For the purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the Bank Board or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either. If there is a conflict between what is required by the FASB and what is re-

quired by the Bank Board, the Bank Board's interpretation shall govern.

Section 16 of the Century Assistance Agreement, in pertinent part, provided:

> This Agreement shall terminate upon the close of the Advances Period, or the conclusion of all obligations of the CORPORATION to indemnify or pay HOME pursuant to this Agreement, whichever last occurs ....

The Century Assistance Agreement also contained an integration clause that integrated FHLBB Resolution 84–415 ("Century Resolution"). The Century Resolution, in pertinent part, provided:

> RESOLVED FURTHER, That in accounting for the Merger and the acquisition of assets and liabilities of Century by Home Savings, Home Savings shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified and interpreted by applicable regulations of the Bank Board and the FSLIC; and
>
> RESOLVED FURTHER, That Home Savings shall furnish an analysis accompanied by a concurring opinion from its independent public accountants, satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision, which (i) specifically describes as of the closing date, any intangible assets, including goodwill or the discounts and premiums arising from the acquisition to be recorded on Home Savings' consolidated books; and (ii) substantiates the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discounts and premiums and the related amortization periods and methods[.]

Home Savings provided the analysis required by the Century Resolution.

On August 10, 1984, the FHLBB issued a net worth deficiency forbearance to Home Savings that, in pertinent part, provided:

> [T]he [FSLIC] will forbear, for a period of five years following consummation of the merger, from exercising its authority, under Section 563.13 [the regulation establishing capital requirements], for any fail-

ure of Home Savings to meet the statutory reserve and net worth requirements of Section 563.13 arising solely from ... Home Savings' assumption of the net worth deficiency of Century as of the Effective Date.

## V. The Ohio Transaction

On May 22, 1985, plaintiffs acquired four failing Ohio thrifts: Permanent Savings and Loan Association ("Permanent"), Oxford Savings Association ("Oxford"), Home Federal Savings and Loan Association ("Home Federal"), and American Savings Bank ("American"). This acquisition took place in several steps. Prior to acquisition by plaintiffs, Permanent was converted into a federally-insured institution that then merged with Oxford and Home Federal. This resulting, federally-insured institution ("New Permanent") then merged with plaintiff Home Savings. American, immediately prior to merger with Home Savings, merged with New American, an interim Ohio building and loan association. New American then merged into Home Savings. Plaintiffs acquired an additional failing Ohio thrift, Savings One Association ("Savings One"), on June 20, 1985. Of the five original thrifts, only Home Federal was insured by the FSLIC prior to the series of transactions just described. The remaining four thrifts ("Ohio-insured Thrifts") were insured by the Ohio Deposit Guarantee Fund ("ODGF"). At the moment of acquisition, however, New Permanent, the institution which resulted from the merger of Permanent, Oxford, and Home Federal, was federally insured. Only New Permanent, New American, and Savings One were directly merged into plaintiff Home Savings.

Also on May 22, 1985, the FSLIC and plaintiffs entered into an assistance agreement regarding the acquisition of the five failing Ohio thrifts ("Ohio Assistance Agreement"). Section 12 of the Ohio Assistance Agreement was identical to § 13 of the Century Assistance Agreement, and § 15 of the Ohio Assistance Agreement was identical to § 16 of the Century Assistance Agreement. Like the Century Assistance Agreement, the Ohio Assistance Agreement also integrated

the FHLBB resolution approving the transaction. In this transaction, that resolution was FHLBB Resolution 85–393 ("Ohio Resolution").

Assistance, within the four corners of the Ohio Assistance Agreement without integrating any other documents, was only given in regard to plaintiffs' acquisition of Home Federal. The Ohio Resolution, integrated into the Ohio Assistance Agreement, however, provided as follows:

> RESOLVED FURTHER, That in accounting for the Acquisition and the Savings One Acquisition, Home Savings shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified and interpreted by applicable regulations of the Bank Board and the FSLIC; and

> RESOLVED FURTHER, That Home Savings shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants, satisfactory to the Principal or other Supervisory Agent of the Bank Board, San Francisco, California ("California Supervisory Agent") and to the Office of Examinations and Supervision, which (i) specifically describes as of the closing date, any intangible assets, including goodwill or the discounts and premiums arising from the Acquisition and the Savings One Acquisition to be recorded on Home Savings' consolidated books; and (ii) substantiates the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discounts and premiums and the related amortization periods and methods ... [.]

The Ohio Resolution defined the term "Acquisition" as those "transactions relating to the acquisition of control of the Ohio Thrifts other than Savings One;" it defined the term "Savings One Acquisition" as the "acquisition of control of Savings One." The "Ohio Thrifts" were defined as American Savings Bank, Permanent Savings and Loan Association, Savings One Association, and Oxford Savings Association. Home Savings provided the analysis required by the Ohio Resolution.

On May 23, 1985, the FHLBB issued a net worth deficiency forbearance to Home Savings that, in pertinent part, provided:

[T]he FSLIC will forbear, for a period of five years following consummation of the merger, from exercising its authority, under Section 563.13 [the regulation establishing capital requirements], as a result of any failure of Home Savings to meet the net worth requirements of Section 563.13 arising solely from ... the assumption by Home Savings of the net worth deficiencies of [Home Federal] as of the Effective Date.

## DISCUSSION

Because we reject the merits of defendant's contentions regarding the first three transactions at issue here and find contractual liability in regard to those transactions, we need not decide whether the government is legally bound by the apparent concession of liability it made in its briefing regarding these three transactions. We turn, therefore, to a discussion of the individual transactions. The Florida/Missouri transaction and the Illinois/Texas transaction are discussed jointly because the relevant provisions of the agreements in the two transactions are identical. Moreover, because the relevant provisions of the agreements in the Century transaction and the Ohio transaction are nearly identical, those two transactions are discussed jointly for the purposes of determining whether a supervisory goodwill promise was made by the government and then breached. The Ohio transaction is discussed separately for the purpose of addressing defendant's unique arguments concerning authority and consideration.

### I. The Florida/Missouri and Illinois/Texas Transactions

■ The essence of defendant's first argument against a finding of liability here is that the plain contractual language used by the parties is unambiguous and does not provide that supervisory goodwill counts in meeting regulatory capital requirements. Therefore, defendant avers, no such promise was made. Responding to this argument, plaintiffs tacitly acknowledge the lack of explicit language regarding the inclusion of supervisory good-

will in regulatory capital but state that a similar lack did not prevent the finding of contractual liability for the breach of express supervisory goodwill contracts in *Winstar*. Pls.' Br. in Resp. to (i) Def.'s Resp. to the Ct.'s Order of Mar. 7, 2001 and (ii) the Ct.'s Order of Mar. 7, 2001 at 8. Based on this reading of *Winstar*, plaintiffs argue that we should find contractual liability here.

*Winstar* stands for the proposition that an express promise binding the government can exist even where there is no unmistakable language of promise. Here, the government has inverted the argument presented in *Winstar* by arguing that the language of the contract here unambiguously *forbids* the finding of a supervisory goodwill promise. This leads us to defendant's second argument.

Defendant's second argument is that, to the extent we determine that the contract language before us does not forbid, on its face, the finding of a supervisory goodwill promise, the *Winstar* decision requires us to determine whether entering into the transactions in question would have been "madness" for plaintiffs absent a promise that supervisory goodwill would count in meeting regulatory capital requirements. Defendant argues that the *Winstar* plurality's finding of a supervisory goodwill promise was predicated on the finding that it would have been "irrational" for the *Winstar* plaintiffs to have acquired the failing thrifts absent such a promise. If the deal would have been rational absent a supervisory goodwill promise, defendant argues, *Winstar* does not dictate a finding that the promise was made and, defendant further asserts, a trial may be necessary in order to determine whether such a promise was made here.

Defendant has misread *Winstar*. If defendant's reading were correct, courts would be put in the position of determining whether a deal was good or bad in order to determine what the terms of the deal were. A contracting party could then argue that a contract contained a certain term merely because the absence of that term would allegedly render the contract irrational from that party's point of view. In that event, however, no contract would ever be safe from post hoc judicial

tinkering. Fortunately, it is not the province of courts to determine whether a deal is good or bad; rather, it is to determine what the terms of the deal were at the time it was entered into by the contracting parties.

The *Winstar* plurality's discussion of the rationality of the Glendale deal absent a supervisory goodwill promise was conducted in the context of resolving an ambiguity in the "reading" of the "documents." *Winstar*, 518 U.S. at 863, 116 S.Ct. 2432. The specific ambiguity addressed was whether the FHLBB resolution under consideration was merely a statement of current regulatory policy or rather a contractual commitment. *Id.* In interpreting the words used by the parties, the plurality found relevant the fact that, in the absence of a contractual commitment that supervisory goodwill would count in meeting regulatory capital requirements, the acquiring bank would have been rendered immediately insolvent. *Id.* The plurality did not find that irrationality alone could create a supervisory goodwill promise without any contract language to anchor that promise, nor did the plurality find that the mere absence of irrationality would render the presence of a supervisory goodwill promise impossible.

Having rejected defendant's "madness" argument, we must still determine whether the contract documents before us contain a promise by the government that supervisory goodwill would count in meeting regulatory capital requirements until such time as the supervisory goodwill acquired from the failing thrift was completely amortized. The nature of the government's argument in this regard here is somewhat different from that presented in *Winstar*. In *Winstar*, the plurality stated, "The Government does not seriously contest th[e] evidence [of the Glendale contract documents] that the parties under-

stood that goodwill arising from these transactions would be treated as satisfying regulatory requirements; it insists, however, that these documents simply reflect statements of then-current federal regulatory policy rather than contractual undertakings." *Id.* at 862, 116 S.Ct. 2432. The proposition "not seriously contest[ed]" by the government in *Winstar* is the very proposition it now contests—namely, that the words contained in the contract documents demonstrate that the "parties understood that goodwill arising from these transactions would be treated as satisfying regulatory requirements." *Id.* The presence of such an understanding, however, was a necessary prerequisite to the holding of *Winstar*, 116 S.Ct. 2432, and, in considering the Winstar transaction, the plurality simply noted that it agreed with "the Federal Circuit's finding that the overall 'documentation in the Winstar transaction establishes an express agreement allowing Winstar to proceed with the merger plan approved by the Bank Board, including the recording of supervisory goodwill as a capital asset for regulatory capital purposes to be amortized'" over a certain period of time. *Id.* at 866, 116 S.Ct. 2432 (citing *Winstar Corp. v. United States*, 64 F.3d 1531, 1544 (Fed.Cir.1995)).

We cannot ignore the fact that the contractual provisions we are called upon to interpret here are remarkably similar to provisions considered in *Winstar*. We are not, therefore, interpreting the words of this contract in a vacuum. Consequently, we find it useful to set out, in table format, the relevant contractual language [9] in these transactions alongside the corresponding language in the documentation of the various transactions at issue in *Winstar* [10] that the Supreme Court found to contain a supervisory goodwill promise.

9. Pursuant to the integration clauses contained in the two assistance agreements under consideration here, the FHLBB resolutions approving the transactions became part of the agreements between the parties.

10. The FHLBB resolution approving the Winstar transaction was not quoted by the Supreme Court, but the plurality noted its agreement with the Federal Circuit's finding that the "overall 'documentation'" in the Winstar transaction

supported finding the presence of a supervisory goodwill promise. *Winstar*, 518 U.S. at 865, 116 S.Ct. 2432. The Federal Circuit found that the language of the FHLBB resolution approving the Winstar transaction was "substantially identical" to that of the FHLBB resolution approving the Glendale transaction. *Winstar*, 64 F.3d at 1544. The language quoted from the Glendale resolution is that quoted by the Federal Circuit. *See id.* at 1540–41.

*WINSTAR* DOCUMENT

**Winstar Forbearance Letter:** "For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by [Winstar] over a period not to exceed 35 years by the straight-line method."

*HOME SAVINGS* DOCUMENT

**Florida/Missouri Resolution:** "RESOLVED FURTHER, That the Bank Board hereby finds that the submission of Home concerning the accounting treatment to be afforded its acquisition of Southern ... appropriately supports the application of the purchase method of accounting for the acquisition; and that based upon such submission, and the circumstances described therein, the Bank Board hereby determines that it does not object to (1) the amount of any resulting intangible assets being first assigned to the acquired savings deposit base in the amount of .5 percent of the acquired savings balances and .05 percent of the acquired certificate balances, which will have a life of ten (10) years, and (2) any excess being assigned to goodwill and initially amortized, in accordance with generally accepted accounting principles, over forty (40) years[.]"

**Accounting Principles section of Winstar Assistance Agreement:** "Except as otherwise provided, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied on a going concern basis in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or adopted concurrently with this Agreement, then this Agreement, such regulations, or such resolution shall govern.... If there is a conflict between such regulations and the Bank Board's resolution or action, the Bank Board's resolution or action shall govern. For purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the Bank Board or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either."

**Accounting Principles section of Florida/Missouri Assistance Agreement:** "Except as otherwise provided herein, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement or with the applicable Federal Regulations, the Agreement or said Regulations shall govern. For purposes of this section, the accounting principles and the governing regulations shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board or any successor organization of the American Institute of Certified Public Accountants respectively. In case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with said Regulations."

**Glendale resolution:** "Not later than sixty days following the effective date of the merger, Glendale shall furnish an opinion from its independent accountant, satisfactory to the Supervisory Agent, which (a) indicates the justification under generally accepted accounting principles for the use of the purchase method of accounting for its merger with Broward, (b) specifically describes, as of the effective Date, any goodwill or discount of assets arising from the merger to be recorded on Glendale's books, and (c) substantiates the reasonableness of amounts attributed to goodwill and the discount of assets and the resulting amortization periods and methods .... Glendale shall submit a stipulation that any goodwill arising from this transaction shall be determined and amortized in accordance with [Bank Board] Memorandum R–31b...."

**Florida/Missouri Resolution:** "RESOLVED FURTHER, That the Bank Board hereby finds that the submission of Home concerning the accounting treatment to be afforded its acquisition of Southern ... appropriately supports the application of the purchase method of accounting for the acquisition; and that based upon such submission, and the circumstances described therein, the Bank Board hereby determines that it does not object to (1) the amount of any resulting intangible assets being first assigned to the acquired savings deposit base in the amount of .5 percent of the acquired savings balances and .05 percent of the acquired certificate balances, which will have a life of ten (10) years, and (2) any excess being assigned to goodwill and initially amortized, in accordance with generally accepted accounting principles, over forty (40) years, *provided* that Home shall furnish an analysis, accompanied by a concurring opinion from its independent accountant satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision which (a) specifically describes, as of the effective date of the Southern Merger, any premiums or discounts on assets or liabilities, or intangible assets to be recorded as a result of the Southern Merger and (b) substantiates the reasonableness of amounts assigned to any tangible or intangible assets or liabilities and the related amortization periods and methods assigned to such amounts[.]"

In the Glendale transaction, the *Winstar* plurality found that the language of the resolution alone was sufficient to support a finding of a supervisory goodwill promise, given its finding that the resolution was integrated into the Glendale assistance agreement. *Winstar*, 518 U.S. at 862, 116 S.Ct. 2432. The plurality quoted the resolution's requirement that Glendale provide "a stipulation that any goodwill arising from this transac-

tion shall be determined and amortized in accordance with [Bank Board] Memorandum R–31b." *Id.* (alteration in original). As noted above and as the plurality noted, Memorandum R–31b "permitted Glendale to use the purchase method of accounting and to recognize goodwill as an asset subject to amortization." *Id.* In the resolutions under consideration here, the FHLBB explicitly stated that it found Home's submission to:

> appropriately support[ ] the application of the purchase method of accounting for the acquisition; and that . . ., the Bank Board . . . d[id] not object to (1) the amount of any resulting intangible assets being first assigned to the acquired savings deposit base . . ., and (2) any excess being assigned to goodwill and initially amortized, in accordance with generally accepted accounting principles, over forty (40) years[.]

Thus, the resolutions here contained within their four corners a reference to purchase method accounting that the Glendale resolution contained only by reference to Resolution R–31b.

Despite these similarities in language, defendant contends that the language before us does not demonstrate that the parties had an understanding that supervisory goodwill would count as a capital asset for regulatory purposes, even though the government did not "seriously contest" that the language contained in the Glendale resolution did demonstrate such an understanding. *Id.* Even if we did not have *Winstar* to guide us, however, we would reject defendant's argument because it flies in the face of the realities of the transactions.

It is uncontroverted that, under the purchase method of accounting, supervisory goodwill was treated as an intangible asset. *See also id.* at 848–49, 116 S.Ct. 2432. It is also uncontroverted that the transactions in question here established schedules for the amortization of goodwill acquired from the failing thrifts.[11] Nevertheless, defendant

contends that, although the parties considered supervisory goodwill an *intangible* asset subject to amortization, they did not consider it a *capital* asset for regulatory purposes. Thus, defendant's argument turns on finding that the intangible assets generated by purchase method accounting were not understood to be regulatory capital assets by the parties.

If the contract does not reflect an understanding by the parties that supervisory goodwill was a regulatory capital asset by virtue of being an intangible asset, it is not clear what purpose any of the contractual language regarding accounting for the transactions would serve. Why would the FHLBB and the FSLIC have an interest in the method employed to account for the acquisitions of the failing thrifts unless that method implicated their roles as regulatory entities?

The mere presence of an amortization schedule in the contract suggests that defendant's interpretation of these contracts is incorrect. If supervisory goodwill was not considered by the parties to be a capital asset for regulatory purposes, a contractual amortization schedule designed to eliminate it over time would have been completely unnecessary. Plaintiffs would have had no objection to not amortizing the asset. As is implicit in their position now, it was in plaintiffs' interest to obtain as long an amortization period as possible. Never having to amortize would have been the best possible scenario for plaintiffs. The only logical reason for the inclusion in the agreements of amortization schedules is that the schedules reflect the regulatory interest of the FHLBB and the FSLIC. If there had been no understanding that supervisory goodwill would count in meeting regulatory capital requirements, there would have been no need to include amortization schedules in the contract. Defendant's proposed interpretation of the contract terms under consideration

---

11. Defendant does argue, however, that the use of the word "initially" to describe the amortization period demonstrates that the risk of a change in the law was placed on plaintiffs. Plaintiffs assert that the word "initially" refers only to that period of time before the independent accountant's opinion was furnished to the

FHLBB pursuant to the resolution. We find plaintiffs' interpretation of the word "initially" to be the more reasonable one. Were we to agree with defendant, the word "initially" would render virtually meaningless the lengthy amortization period clearly intended to be allowed.

here is thus unreasonable. We find that, at the time of contracting, the parties understood that supervisory goodwill would count in meeting regulatory capital requirements.

Defendant has presented three final arguments we must address. First, defendant argues that the presence of the words "does not object to" in the resolutions defeats the finding of a promise. It is difficult to see the difference in meaning between the words "does not object to" and the word "may" as used in the Winstar forbearance letter, quoted above. The Supreme Court found that the word "may" was sufficient to support the finding of a promise. *Id.* at 864–64, 116 S.Ct. 2432. Given that finding, we have no basis to not find a promise here. Additionally, the absence in the Florida/Missouri and Illinois/Texas resolutions of the words "[f]or purposes of reporting to the Board" is not fatal to plaintiffs' claim here. The only reason for discussing accounting in the resolutions at all was the fact that the FHLBB and the FSLIC would continue to regulate the plaintiffs' thrift in the future.

The second of defendant's final arguments we consider is that the accounting principles sections of the assistance agreements in these two transactions left the risk of a change in the law on plaintiffs. The accounting principles section provided that, where GAAP conflicted with the assistance agreement or applicable regulations, "the Agreement or said Regulations shall govern" and further stated that "the accounting principles and the governing regulations shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board or any successor organization of the American Institute of Certified Public Accountants respectively." As we note below in our discussion of breach, FIRREA and its implementing regulations were not mere clarifications or interpretations of the regulations in place at the time of these transactions. Thus, the government's argument that the parties placed the risk of a wholesale change in the law on plaintiffs is erroneous.

Finally, the government argues that these contracts, according to their own terms, terminated prior to any alleged breach by the government. Defendant cites the termination sections of the assistance agreements in support of this argument. This same argument in regard to the Glendale and Winstar transactions, however, has already been addressed by the Federal Circuit in its opinion in *Winstar*. The Federal Circuit did not quote the relevant language from the Glendale assistance agreement but simply stated:

> The government makes two additional arguments why the Court of Federal Claims' interpretation was wrong. First it contends that the SAA [Supervisory Action Agreement] expired by its terms in November 1991, prior to the alleged breach. We view the expiration provision as only relating to executory provisions set out in the SAA, which obligated the FSLIC to make certain payments to the merged thrift for a limited period of time. This provision of the SAA in any event does not negate other obligations under the merger plan, including the specific time periods for amortization of goodwill.

*Winstar,* 64 F.3d at 1542. The Federal Circuit went on to reject this argument in regard to the Winstar transaction "for the same reasons as in the Glendale transaction." *Id.* at 1544. We find this reasoning persuasive and do not doubt its applicability here. The Florida/Missouri and Illinois/Texas assistance agreements contained promises of certain amortization periods. Those promises would be rendered meaningless by the government's interpretation of the termination provisions. We find that the FHLBB and the FSLIC promised that plaintiffs would be able to count supervisory goodwill acquired in the Florida/Missouri and Illinois/Texas transactions in meeting their regulatory capital requirements until such goodwill was completely amortized.

■ Having found a supervisory goodwill promise, we must now decide whether that promise was breached. Here, we have clear precedent from the Supreme Court. As the plurality stated:

> When the law as to capital requirements changed ..., the Government was unable to perform its promise and, therefore, became liable for breach. We accept the Federal Circuit's conclusion that the Gov-

ernment breached these contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA ..., the federal regulatory agencies limited the use of supervisory goodwill ... in calculating respondents' net worth.

*Winstar*, 518 U.S. at 870, 116 S.Ct. 2432. At oral argument, defendant's counsel suggested that FIRREA was merely a clarification of the law rather than a wholesale change. This is fundamentally at odds with the Court's finding of a contract breach in *Winstar* and with the plurality's characterization of the post-FIRREA regulatory capital requirements as "new." We reject defendant's argument that FIRREA was simply a clarification of pre-existing law and find that the limitation imposed by FIRREA on plaintiffs'

ability to count supervisory goodwill in meeting their regulatory capital requirements constituted a breach of the contracts entered into by plaintiffs and the government in the Florida/Missouri and Illinois/Texas transactions.

## II. The Century and Ohio Transactions

### A. Presence of Supervisory Goodwill Promises

■ Again, we find it useful to compare the relevant contractual language in these transactions alongside the corresponding language in the documentation of the various transactions at issue in *Winstar* that the Supreme Court found to contain a supervisory goodwill promise.

**WINSTAR DOCUMENT**

Accounting Principles section of Winstar Assistance Agreement: "Except as otherwise provided, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied on a going concern basis in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or adopted concurrently with this Agreement, then this Agreement, such regulations, or such resolution shall govern.... If there is a conflict between such regulations and the Bank Board's resolution or action, the Bank Board's resolution or action shall govern. For purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the Bank Board or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either."

**HOME SAVINGS DOCUMENT**

Accounting Principles section of Century Assistance Agreement: "Except as otherwise provided, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry; except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the CORPORATION, or any resolution or action of the Bank Board approving, or adopted concurrently with, this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolution or action. If there is a conflict between such regulations and the Bank Board's resolution or action, the Bank Board's resolution or action shall govern. For the purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the Bank Board or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either. If there is a conflict between what is required by the FASB and what is required by the Bank Board, the Bank Board's interpretation shall govern."

Glendale resolution: "Not later than sixty days following the effective date of the merger, Glendale shall furnish an opinion from its independent accountant, satisfactory to the supervisory Agent, which (a) indicates the justification under generally accepted accounting principles for the use of the purchase method of accounting for its merger with Broward, (b) specifically describes, as of the effective Date, any goodwill or discount of assets arising from the merger to be recorded on Glendale's books, and (c) substantiates the reasonableness of amounts attributed to goodwill and the discount of assets and the resulting amortization periods and methods .... Glendale shall submit a stipulation that any goodwill arising from this transaction shall be determined and amortized in accordance with [Bank Board] Memorandum R-31b...."

Century Resolution: RESOLVED FURTHER, That in accounting for the Merger and the acquisition of assets and liabilities of Century by Home Savings, Home savings shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified and interpreted by applicable regulations of the Bank Board and the FSLIC; and

RESOLVED FURTHER, That Home Savings shall furnish an analysis accompanied by a concurring opinion from its independent public accountants, satisfactory to

the Supervisory Agent and to the Office of Examinations and Supervision, which (i) specifically describes as of the closing date, any intangible assets, including goodwill or the discounts and premiums arising from the acquisition to be recorded on Home Savings' consolidated books; and (ii) substantiates the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discounts and premiums and the related amortization periods and methods[.]

In these transactions, plaintiffs were directed to utilize GAAP in accounting for the acquisition of the failing thrifts. Although there is no explicit reference made to purchase method accounting, GAAP at the time allowed these acquisitions to be accounted for using the purchase method, and it is uncontroverted that the purchase method was, in fact, used to account for these acquisitions. Furthermore, the resolutions contemplated that the transactions would generate "intangible assets, including goodwill." This indicates that the parties had purchase method accounting in mind when providing that GAAP would govern the acquisitions. Consequently, our discussion of purchase method accounting and intangible assets in the context of the Florida/Missouri and Illinois/Texas transactions is fully relevant here; and, for the same reasons we found a supervisory goodwill promise contained in the language of those transactions, we find one here.

The assistance agreements' termination provisions and the terms of the net worth deficiency forbearance letters do not prevent finding a promise to count supervisory goodwill as regulatory capital until the goodwill was completely amortized. For the same reasons as discussed *supra* at 18, the termination provisions contained in these two contracts did not serve to cut short the supervisory goodwill promise. Additionally, the government's argument based on the net worth deficiency forbearance letters has recently been rejected by the Federal Circuit:

> Notably, the government did not claim that the expiration of the net worth forebearances barred the inclusion of supervisory goodwill for regulatory capital purposes until the common issue proceedings that led to the instant summary judgment of liability in 1997. The Court of Federal Claims agreed with the PCC that two of the three *Winstar* test cases involved forbearance letters issued by the FHLBB

that contained net worth forebearances similar, if not identical to those now at issue. In those cases, the Supreme Court allowed amortization of goodwill over the entire period authorized by the forebearances and not merely for the five-year term of the net worth forebearances. These contracts permitting special accounting treatment of supervisory goodwill were breached by FIRREA and its regulations. We view the five-year expiration provision as relating only to the net worth forebearances that barred the FHLBB from enforcing its capital requirements for five years to the extent that any violation of those requirements was traceable to the subject acquisitions. The terms of the forbearance letters permitting the amortization over 35 to 40 years were separate and apart from the five-year enforcement-related terms. In any event, the five-year expiration provision of the net worth forebearances does not negate other obligations under the merger plan, including the specific time period for amortization of goodwill.

*Cal. Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1348 (Fed.Cir.2001) (citations omitted). The rationale of the Federal Circuit's holding applies here. It is uncontroverted that GAAP and FHLBB policy at the time of these transactions allowed for a significantly longer amortization period for goodwill than five years. By promising that plaintiffs could use GAAP, the FHLBB and the FSLIC implicitly promised a longer amortization period than five years. For this reason and for the reasons discussed above, we find that the government promised that the purchase method could be used to account for the Century and Ohio transactions and that any supervisory goodwill resulting from the application of the purchase method would count in meeting regulatory capital

requirements until such goodwill was completely amortized.

### B. Consideration for and Authority to Make a Supervisory Goodwill Promise in the Ohio Transaction Contract

The government contends that there was no consideration for the promise regarding supervisory goodwill acquired from the Ohio-insured Thrifts and that, even if there was the necessary consideration, such a promise was unauthorized because the Ohio-insured Thrifts were not insured by the FSLIC. We agree that the promise was unauthorized in that respect and, therefore, do not reach defendant's consideration argument.

■ It is well-settled that agencies of the United States can only bind the government when they contract within the scope of the authority delegated to them by Congress. *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). The question here, therefore, is whether the United States Code ("Code"), as it existed in 1985, authorized the FSLIC and the FHLBB to promise plaintiffs that they could include supervisory goodwill, acquired from thrifts not insured by the FSLIC, in meeting their capital reserve requirements.

■ The government does not contend that the FSLIC and the FHLBB generally lacked the authority to make a promise that supervisory goodwill could be included in meeting capital reserve requirements. That argument was foreclosed by *Winstar. Winstar*, 518 U.S. at 890. Rather, the government argues that the FSLIC and the FHLBB could not make this promise in regard to supervisory goodwill acquired from thrifts not previously insured by the FSLIC.

The statutory provisions relevant to the question before us are contained in Title 12 of the Code. Defendant turns the court's attention to 12 U.S.C. § 1729 (1988) (repealed 1989).[12] The *Winstar* plurality relied, in part, upon this section in finding that the FSLIC and the FHLBB possessed the authority to make a promise regarding supervi-

sory goodwill; the *Winstar* plurality, however, did not address the specific question we consider here. Section 1729(f) concerned assistance to thrift institutions and, in pertinent part, provided:

(2)(A) In order to facilitate a merger or consolidation of an insured institution described in subparagraph (B) with another insured institution or the sale of assets of such insured institution and the assumption of such insured institution's liabilities by another insured institution, the Corporation is authorized, in its sole discretion and upon such terms and conditions as the Corporation may prescribe—

. . .

(iii) to guarantee such other insured institution . . . against loss by reason of such other insured institution's merging or consolidating with or assuming the liabilities and purchasing the assets of such insured institution . . . .

12 U.S.C. § 1729 (1988) (repealed 1989). An insured institution was defined as an "institution whose accounts are insured under this subchapter." 12 U.S.C. § 1724 (1988) (repealed 1989).

The definition of an insured institution in § 1724 precludes us from finding that § 1729 authorized the FSLIC to make any promise directed at plaintiffs' acquisition of the Ohio-insured Thrifts. The plain language of § 1729, by virtue of the definition provided in § 1724, only authorizes the FSLIC, "[i]n order to facilitate a merger or consolidation of an *insured institution* . . . with another *insured institution*," to make promises to guarantee an acquiring institution against loss *"by reason of* such [acquiring] insured institution's merging or consolidating with or assuming the liabilities and purchasing the assets of such [acquired] insured institution." Even though a supervisory goodwill promise functioned as a guarantee against loss, *see Winstar*, 518 U.S. at 890, 116 S.Ct. 2432, the Ohio-insured Thrifts were not insured insti-

---

**12.** The quoted provisions from the 1988 version of the Code are the same as those in effect at the time of the Ohio transaction.

tutions within the meaning of § 1729. Furthermore, although Home Federal was federally insured, the FSLIC could only guarantee against losses sustained "by reason of" an acquirer's merger with an insured institution. Therefore, under § 1729, the FSLIC could promise to guarantee Home Savings only against losses caused by its acquisition of Home Federal. Section 1729 did not grant the FSLIC the authority to make a promise regarding the Ohio-insured Thrifts.

The fact that New Permanent was federally-insured at the moment of acquisition by plaintiffs does not alter our conclusion that the FHLBB and the FSLIC did not possess authority, under § 1729, to make a promise of assistance regarding the Ohio-insured Thrifts. We must look to the substance of the transaction. Our interpretation of the statute cannot turn on the fact that some of the Ohio-insured Thrifts were subsumed in a federally-insured institution immediately prior to acquisition by plaintiffs. That takeover was part of the acquisition itself. The substance of the Ohio transaction is that plaintiffs acquired four Ohio-insured institutions and one federally-insured institution.

The other Code sections cited by plaintiffs in support of their argument that the FHLBB and the FSLIC had authority to make promises directed at the Ohio-insured Thrifts deal generally with the FHLBB and the FSLIC's authority to contract or to regulate. Section 1729, however, specifically addressed the authority of the FHLBB and the FSLIC to give assistance to thrift institutions. Having found that a Code section specifically addressing assistance to thrift institutions does not contain the grant of authority alleged by plaintiffs, we cannot find that authority in more general Code sections. See Morton v. Mancari, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (citations omitted) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). The FHLBB and the FSLIC had no authority to promise plaintiffs that supervisory goodwill acquired from the Ohio-insured Thrifts would count in meeting regulatory capital requirements; those entities only possessed authority to make such a promise regarding supervisory goodwill acquired from Home Federal.

### C. Breach of Supervisory Goodwill Promises

We have found that a supervisory goodwill promise was made in the Century transaction contract and in the Ohio transaction contract concerning plaintiffs' acquisition of Home Federal. For the reasons discussed in regard to the Florida/Missouri and Illinois/Texas transactions, we find that the limitation imposed by FIRREA on plaintiffs' ability to count supervisory goodwill in meeting their regulatory capital requirements constituted a breach of the contracts entered into by plaintiffs and the government in the Century transaction and in the Ohio transaction as regarding plaintiffs' acquisition of Home Federal.

### CONCLUSION

Plaintiffs' Motion for Partial Summary Judgment is granted in part and denied in part. Defendant's Cross-motion for Summary Judgment is granted in part and denied in part. The Motion of Plaintiffs' Coordinating Committee for Leave to File, as Amicus Curiae, Memorandum in Support of Response by Plaintiffs to Court's Order of March 7, 2001, is denied as moot. Defendant's Partial Motion to Dismiss remains pending. On or before June 29, 2001, the parties shall file a joint proposed schedule for resolving remaining issues.