HOME SAVINGS OF AMERICA, F.S.B., and H.F. Ahmanson & Co., Plaintiffs,

v.

THE UNITED STATES of America, Defendant.

No. 92–620C.

United States Court of Federal Claims.

Jan. 16, 2002.

Michael A. Carvin, Steven S. Rosenthal, Jeffery A. Tomasevich, and Douglas A. Tucker, each of Washington, D.C., for plaintiffs.

Lee M. Straus, Trial Attorney, Commercial Litigation Branch, United States Department of Justice, argued for defendant. With him on the briefs were Stuart E. Schiffer, Acting Assistant Attorney General, Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, and Jordan A. Thomas, Trial Attorney, of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related[1] case are plaintiffs' Motion for Leave to File Notice of Supplemental Authority, defendant's Renewed Motion to Dismiss Counts II Through IV of Home's Complaint, and defendant's Motion for Summary Judgment on Home's Theory of the Cost of Replacement. Oral argument was held on December 21, 2001. For the following reasons, plaintiffs' motion is granted, defendant's motion to dismiss counts II, III, and IV is granted, and its motion for summary judgment with respect to count I is denied.

## BACKGROUND

Plaintiffs are Home Savings of America, F.S.B. ("Home Savings") and its holding company, H.F. Ahmanson & Co. ("Ahmanson"). Home Savings is a wholly-owned subsidiary of Ahmanson. Defendant is the

---

1. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

United States. The complaint alleges that a series of contracts between the United States and both plaintiffs arising out of the supervised acquisition by plaintiffs of failing depository institutions was breached by the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183, along with related regulations. Count I alleges that FIRREA breached the contracts insofar as it disallowed the recognition of supervisory goodwill that Home Savings had been allowed as part of the assistance contracts. Count II alleges that FIRREA's restrictions were unauthorized. Count III alleges that FIRREA and associated regulatory changes worked a taking without compensation of plaintiffs' property interests. Count IV alleges that these changes violated plaintiffs' due process rights.

Plaintiffs do not contest the dismissal of counts II and IV. In addition, they have limited their theory of recovery under count I to plaintiff Ahmanson's claim for damage.

In *Home Savings of America, F.S.B. v. United States,* 50 Fed.Cl. 427 (2001), we held three things: (1) that the government promised plaintiffs that they would be able to count supervisory goodwill gained from their acquisition of failing thrifts towards meeting their regulatory capital requirements until the goodwill was completely amortized, 50 Fed.Cl. at 438; (2) FIRREA's limitation on plaintiffs' ability to count supervisory goodwill in meeting the requirements amounted to a breach of the contracts between plaintiffs and the government, *id.* at 439; and (3) that the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB") lacked authority to promise plaintiffs that supervisory goodwill could be included in meeting the requirements with respect to the acquisition of certain non-federally insured banks in Ohio, *id.* at 442.

Between 1981 and 1985, Home Savings and/or Ahmanson completed four acquisitions, which we have previously referred to as the "Florida/Missouri," "Illinois/Texas," "Century," and "Ohio" transactions. *Id.* at 429. The acquisitions were supervised by

FSLIC and FHLBB, making each a supervisory merger.

At least three documents were necessary to effectuate the acquisitions: a resolution by FHLBB approving the acquisition by Ahmanson through merger of the target banks into Home Savings; an assistance agreement between Home Savings and FSLIC; and a merger agreement between Home Savings and a target bank. Resolving the government's motion for summary judgment, insofar as it challenges the standing of Ahmanson to recover the cost of replacement capital, requires a close examination of these documents.

*The Florida/Missouri Transaction*

On December 17, 1981, FHLBB released Resolution No. 81–803. Resolution 81–803 noted that Home Savings and Southern Federal Savings and Loan Association of Pompano Beach, Florida ("Southern"), had formulated a Merger Agreement pursuant to which Southern would merge into Home Savings following Home Savings' conversion to a federally chartered association named "Home Savings of America, a Federal Savings and Loan Association," referred to in the resolution as the "Resulting Association." The merger was referred to as the "Southern Merger." The resolution also noted that Southern and Home Savings had applied to FHLBB for approval of the Southern Merger and that Home Savings had applied to FSLIC for an increase in its accounts of an insurable type as part of the merger.

Resolution 81–803 also noted that Home Savings was Ahmanson's insured subsidiary. Ahmanson had filed an application with FSLIC for approval of its acquisition of Southern by the process of merger with Home Savings following Southern's acquisition by merger of Hamiltonian Federal Savings and Loan Association of Ladue, Missouri ("Hamiltonian"), and Security Federal Savings and Loan Association of Sikeston, Missouri ("Security"), and Home Savings' conversion to a federal stock savings and loan association pursuant to the Federal Savings and Loan System Regulations. The Southern Merger was conditioned upon the effectuation of an execution agreement between Home Savings and FSLIC ("Southern

Assistance Agreement"), by which FSLIC agreed to provide default indemnification to Home Savings in order to prevent the default of Southern, Hamiltonian, and Security.

At the time of the transaction, all three thrifts were insolvent or nearly so on a book basis. Home Savings recorded the Florida/Missouri Transaction using the purchase method of accounting and agreed to amortize goodwill in accordance with Generally Accepted Accounting Principles ("GAAP"). Home Savings did not contribute capital to reduce the thrifts' net worth deficit.

*The Illinois/Texas Transaction*

On January 14, 1982, FHLBB executed Resolution No. 82–29. Resolution 82–29 stated that FHLBB appointed FSLIC as receiver for Royal Federal Savings and Loan Association in Dallas, Texas ("Royal"). In that resolution, FHLBB noted that it had considered a proposed acquisition agreement between Home Savings and FSLIC as receiver for Royal ("Royal Acquisition Agreement"), by which Home Savings would purchase nearly all of Royal's assets and assume nearly all of its liabilities. FHLBB also noted that it had considered a proposed receiver's agreement between FSLIC, as receiver for Royal, and FSLIC in its corporate capacity by which it would purchase from FSLIC as receiver all assets of Royal not purchased by Home Savings and would assume all liabilities and expenses of FSLIC as receiver.

The resolution further noted that Ahmanson had filed an application with FSLIC for approval of its acquisition, through Home Savings, of Royal and Hyde Park and of its acquisition of El Centro following El Centro's acquisition of Civic, Republic, and Buffalo. Ahmanson's proposed acquisition was approved.

Resolution 82–29 also noted that Home Savings had adopted a plan of merger entitled the "Hyde Park Merger Agreement," presumptively with Hyde Park Federal Savings and Loan Association ("Hyde Park"), and that it had applied to FHLBB for approval of this merger (the "Hyde Park Merger") and FSLIC for approval of its accounts of an insurable type as a part of the merger. Home Savings also had adopted a plan of merger entitled the "El Centro Merger Agreement," presumptively with El Centro Federal Savings and Loan Association ("El Centro"), and applied to FHLBB for approval of this merger (the "El Centro Merger") and to the FSLIC for approval of its accounts of an insurable type as a part of the merger.

Resolution 82–29 stated that the Royal Acquisition Agreement, the Hyde Park Merger Agreement, and the El Centro Merger Agreement were each conditioned upon the execution of an assistance agreement between FSLIC in its corporate capacity and Home Savings (the "Illinois/Texas Assistance Agreement"). The Illinois/Texas Assistance Agreement provided that FSLIC would indemnify Home Savings against losses it could potentially sustain as a result of entering into any of the three agreements.

The resolution further noted that FHLBB had appointed FSLIC as receiver for Civic Savings and Loan Association in Irving, Texas ("Civic"), and two institutions in Houston: Republic of Texas Savings Association ("Republic") and Buffalo Savings and Loan Association ("Buffalo"). FHLBB considered separate acquisition agreements between each of the receivers of Civic, Republic, and Buffalo by which FSLIC, in its corporate capacity, agreed to purchase from each receiver all assets of Civic, Republic, and Buffalo not purchased by Home Savings and to assume all liabilities and expenses of the receiver.

Resolution 82–29 also noted that FHLBB approved El Centro's proposed acquisitions of Civic, Republic, and Buffalo and the resulting increase in El Centro's accounts of an insurable type. The effectiveness of the Civic, Republic, and Buffalo acquisition agreements was conditioned in each case upon the effectiveness of the El Centro Merger.

FHLBB also approved Home Savings' proposed acquisition of the assets of Royal, Home Savings' proposed mergers with El Centro and Hyde Park, and the resulting increase in Home Savings' insurable accounts. It found that approval of the acquisitions by Home Savings and Ahmanson was necessary to prevent the probable failures of Buffalo, Civic, Republic, Royal, El Centro, and Hyde Park, as was Home Savings' acqui-

sition of Royal's assets and liabilities and the merger of both Hyde Park and El Centro into Home Savings.

At the time of the Illinois/Texas Transaction, each of the thrifts was insolvent or nearly so on a book basis. Home Savings recorded the transaction using the purchase method of accounting and agreed to amortize the resulting goodwill in accordance with GAAP. Home Savings did not contribute capital to reduce the thrifts' net worth deficit.

*The Century Transaction*

On August 10, 1984, FHLBB released Resolution No. 84–415. Resolution 84–415 noted that Home Savings was a wholly-owned subsidiary of Ahmanson, which had submitted an application to FSLIC for approval to acquire control of Century Federal Savings and Loan Association in Cedarhurst, New York ("Century"), through the merger of Century with and into Home Savings ("Century Merger") via the "Century Merger Agreement." The resolution also noted that Home Savings and Century had applied to FHLBB for approval of the merger and that Home Savings had also applied to FSLIC for approval of the increase in insurable accounts that would result from the merger.

Resolution 84–415 further stated that Ahmanson's acquisition of control of Century and the Century Merger were conditioned upon the execution of an assistance agreement between Home Savings and FSLIC (the "Century Assistance Agreement") under which FSLIC agreed to loan Home Savings $700 million to facilitate the merger. FSLIC borrowed the money from FHLBB. FHLBB approved the merger of Century into Home Savings and the resulting increase in its insurable accounts as necessary to prevent Century's failure.

Additionally, FHLBB considered Ahmanson's, Home Savings', and Century's resources and future prospects and found that Ahmanson's proposed acquisition of control of Century would not be detrimental to Home Savings, Century, or FSLIC. Ahmanson's acquisition of control was, therefore, approved.

At the time of Resolution 84–415, Century was insolvent on a book basis. Home Savings recorded the Century transaction using the purchase method of accounting and agreed to amortize the resulting goodwill in accordance with GAAP.

*The Ohio Transaction*

On May 21, 1985, FHLBB released Resolution No. 85–393. It stated that Home Savings was a wholly-owned subsidiary of Ahmanson, which had applied to FSLIC for approval to acquire Home Federal Savings and Loan Association ("Home Federal") and a group of savings institutions, collectively referred to as the "Ohio Thrifts." This group included American Savings Bank ("American") in Worthington, Ohio, Permanent Savings and Loan Association ("Permanent") in Hamilton, Ohio, Savings One Association ("Savings One") in Gahanna, Ohio, and Oxford Savings Association ("Oxford") in Oxford, Ohio. Ahmanson proposed that Permanent be converted from an Ohio chartered stock savings and loan association to a federally chartered stock association ("Converted Permanent"), that Oxford merge into Home Federal, creating "Home Oxford," that Home Oxford merge with and into Converted Permanent, creating "Permanent Federal," that American merge into an Ohio chartered interim stock savings and loan association ("New American"), and that Home Savings acquire all of the outstanding stock of Permanent Federal, New American, and Savings One and merge each of those institutions with and into itself.

Resolution No. 85–393 noted that Ahmanson and Home Savings had applied to FHLBB for approval of the acquisition of these institutions and that Home Savings had applied to FSLIC for approval of the increase in its insurable accounts that would result from the acquisition. It also noted that Ahmanson's acquisition of the assets, liabilities, ownership equity, and operations of Home Federal by Home Savings was conditioned upon the execution of an assistance agreement between Home Savings and FSLIC under which FSLIC would loan Home Savings $200 million ("Ohio Assistance Agreement"). To raise the money, FSLIC

would obtain a loan from Federal Home Loan Bank of Cincinnati.

In the resolution, FHLBB approved the merger of Savings One, Permanent Federal, and New American into Home Savings. It also noted that it had considered the resources and future prospects of Ahmanson, Home Savings, Home Federal, and the Ohio Thrifts and that it approved Ahmanson's acquisition of control of Home Federal and the Ohio Thrifts. Such approval was necessary, according to FHLBB, to prevent the failure of those institutions.

Home Federal was the only federally insured thrift and was nearly insolvent on a book basis. Home Savings recorded the Ohio Transaction using the purchase method of accounting and agreed to amortize the resulting goodwill in accordance with GAAP.

*The Assistance Agreements*

The assistance agreements for each of these transactions identify Home Savings as the "resulting association" or the "acquiring association" and FSLIC as the "corporation." The agreements contain a "Sole Benefit" provision which states, in part, that "[n]othing expressed or referred to herein is intended or shall be construed to give any person other than the CORPORATION, or the RESULTING ASSOCIATION, any legal or equitable right, remedy, or claim under or in respect to this Agreement." They also contain integration provisions. The Southern Assistance Agreement and the Illinois/Texas Assistance Agreement contain essentially identical integration provisions:

> § 16 *Entire Agreement, Modification, Headings.* This Agreement, together with any interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties hereto and supercedes all prior agreements and understandings of the parties in connection herewith, excepting only the merger agreement between SOUTHERN and HOME and any resolutions or letters issued contemporaneously herewith by [FHLBB] or [FSLIC] . . . .

Southern Assistance Agreement at ¶ 16; Illinois/Texas Assistance Agreement at ¶ 16. The Century and Ohio Assistance Agreements also contain essentially identical integration provisions:

> § 19 *Entire Agreement, Severability.* (a) This Agreement . . . together with any interpretation or understanding agreed to in writing by the parties, constitute[s] the entire agreement between the parties and supercede[s] all prior agreements and understandings of the parties in connection therewith, excepting only the Merger Agreement and any resolutions or letters issued contemporaneously with this Agreement by [FHLBB] or [FSLIC] . . . .

Century Assistance Agreement at ¶ 19; Ohio Assistance Agreement at ¶ 18.

*Subsequent Events*

During the 1990s, Home Savings sold its acquired thrifts, in all states except Texas, allegedly for "strategic reasons unrelated to the phaseout of goodwill." Plaintiffs' Statement of Genuine Issues at ¶ 2. The parties disagree as to whether or not Home Savings would have retained the thrifts absent the phaseout.

In November 1993, Home Savings completed the sale of the Missouri branches and deposits it acquired in the Florida/Missouri transaction. In November 1994, it completed the sale of the Illinois branches and deposits it acquired in the Illinois/Texas transaction. The parties disagree as to whether or not, in January 1995, Home Savings completed the sale of the branches and deposits it obtained in the Ohio transaction.[2] In September 1995, it completed the sale of its branches and deposits in New York, including the branches and deposits it acquired in the Century transaction. In July 1998, it completed the sale of the Florida branches and deposits it obtained in the Florida/Missouri transaction.

The phaseout period under FIRREA ended January 1, 1995. Defendant maintains that, for the purposes of regulatory reporting, while goodwill was phased out from regulatory capital, Home Savings wrote off its

---

**2.** Plaintiffs assert that the document relied upon by defendant does not support the proposition that Home Savings completed the sale of its Ohio branches and deposits in January, 1995. They also assert that this fact is legally irrelevant to defendant's motion.

goodwill when it completed the sale of acquired branches and deposits in a state and that it would have done so irrespective of FIRREA. In response to its interrogatory concerning the amount of goodwill plaintiffs would have reported absent the phaseout, defendant points out that plaintiffs provided it with a "goodwill schedule" stating that they "assumed that goodwill would be zero after the final sale of branches and deposits within each state." Defendant's App. at 3.

Plaintiffs disagree. They assert that, after it became clear supervisory goodwill could not be counted as regulatory capital, Home Savings wrote off GAAP goodwill when it completed the sale of acquired branches and deposits in each state. They also maintain that the "goodwill schedule" they provided to defendant in response to its interrogatory did not indicate their opinion as to whether they would have written off their regulatory goodwill upon selling branches if defendants had not breached the contracts; rather, they simply distinguished the goodwill involved in the contracts at issue here from extraneous goodwill.

When FIRREA was enacted in August 1989, Home Savings' regulatory capital totaled $2,003,716,000, nearly $1 billion in excess of its required regulatory capital of $1,077,441,000, prior to giving effect to FIRREA's provisions. Plaintiffs also assert that, at that time, Home Savings carried $612,523,000 of unamortized goodwill. In a quarterly report in 1989, Ahmanson announced that it expected Home Savings to meet FIRREA's new capital requirements without great difficulty. The parties disagree as to whether Home Savings has continually met FIRREA's requirements.

In its 1989 Annual Report, Ahmanson stated:

The process of industry consolidation will gain momentum in 1990 and beyond, as increasingly stringent capital requirements take effect, and as smaller thrifts seek merger partners in order to achieve the levels of efficiency necessary to compete and prosper in the financial marketplace of the 1990s.

. . . .

... The well-capitalized, efficient high volume/low cost producers will survive and prosper. Those that aren't won't.

Ahmanson is the prototype of the emerging superthrift.

In its 1992 Annual Report, Ahmanson stated:

[FIRREA] marked the beginning of a new era of re-regulation for savings and loan institutions. This sweeping legislation imposed stringent capital requirements, required increased emphasis on residential mortgage lending and restricted investment activities. It was about time.

Between FIRREA's enactment and the end of 1994, Ahmanson issued over $1 billion of preferred stock, subordinated debt, and unsubordinated debt. The parties dispute how much money from these transactions Ahmanson contributed to Home Savings as regulatory capital. Defendant asserts that Ahmanson raised this capital after FIRREA's enactment to facilitate potential acquisitions and compliance with the "non-breaching" provisions of FIRREA, such as its new risk-based capital requirement and the exclusion of direct investments in real estate from regulatory capital. Plaintiffs assert that, although they raised capital both before and after FIRREA's enactment for multiple reasons, FIRREA prompted them to raise $364 million more in capital than they would otherwise have had to. The costs of raising and servicing this additional capital are the costs they seek in this litigation.

By contrast, defendant asserts that, in 1995, plaintiffs concluded that they had excess capital and Ahmanson began a stock-repurchase program that exceeded $1.6 billion by 1998, when Home Savings and Ahmanson were acquired by Washington Mutual, Inc. Plaintiffs dispute this assertion; instead, they argue that, in 1995, they concluded that the sale of the New York branch system had created substantial capital in excess of what Home Savings needed for near-term growth or expansion and that the repurchase of stock would positively effect both Ahmanson's earnings per share and its stock price. Plaintiffs do not contest the fact that Ahmanson redeemed the preferred stock issued in September 1991, February 1993, August 1993, September 1996,

and September 1998. These dates, they assert, were taken into account by their expert in calculating the damages plaintiffs allegedly suffered.

After the enactment of FIRREA, Home Savings could no longer count goodwill toward its regulatory capital requirements. Over a five year period, FIRREA phased out the inclusion of goodwill in regulatory capital. On September 4, 1992, plaintiffs initiated this lawsuit, alleging that, by enacting FIRREA, defendant breached a promise that they would be allowed to include supervisory goodwill in meeting capital reserve requirements.

## DISCUSSION

### 1. Defendant's Motion to Dismiss

The complaint has four counts. Defendant has moved to dismiss counts II through IV. Plaintiffs do not oppose dismissal of count II, which contests the authority of the Office of Thrift Supervision to exclude supervisory goodwill from regulatory capital, or count IV, which concerns the deprivation of their property without due process of law. Accordingly, we focus on count III, by which plaintiffs assert that the enactment of FIRREA and its associated regulations constituted an uncompensated taking of their property in violation of the Fifth Amendment.

Defendant contends that there is no property interest alleged other than the contracts at issue, and the only remedy available is thus under a contract theory. Plaintiffs argue that, at the minimum, this court should stay their takings claim until they can be assured of obtaining final judgment on their contract claims. They point out that, in our May 18, 2001 opinion, we held that they entered into contracts with defendant that allowed Home Savings to include goodwill in its regulatory capital and that FIRREA breached that agreement. Plaintiffs argue that, because defendant could ultimately prevail on the contract damages issue, they might have no relief for an admitted breach other than under a takings theory. They also contend that, because defendant is immune from paying interest on a non-Contract

Disputes Act[3] contract claim, they can only obtain full relief under a takings theory.

In addition, plaintiffs argue that, even in the absence of contracts, their dealings with defendant created property interests subject to Fifth Amendment protection. Specifically, they contend that their expectations in the continued availability of supervisory goodwill constitutes an independent property interest. This argument has particular significance in connection with the non-federally insured institutions acquired in the Ohio transaction, as to which the court found certain promises unenforceable. *See Home Savings,* 50 Fed. Cl. at 441.

For the reasons set out below, we agree with defendant that a takings claim does not lie here as a matter of law.

■ The Court of Claims taught that the concept of a taking has limited application when rights have been voluntarily created by contract. Interference with contract rights generally gives rise to a breach claim because the parties' rights emanate from the contract, and not from a "taking" for public use. *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978). Such takings claims have been rejected in two other *Winstar*-related cases—*Coast Federal Bank, FSB v. United States,* 48 Fed.Cl. 402, 443 (2000), *appeal docketed,* Nos. 02–5032, –5044 (Fed. Cir.2001), and *Castle v. United States,* 48 Fed.Cl. 187 (2000), *appeal docketed,* Nos. 01–5047, –5050 (Fed.Cir.2001).

■ Plaintiffs are correct that the Fifth Amendment affords protection to private property, including contract rights. *See Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); *Perry v. United States,* 294 U.S. 330, 350–51, 55 S.Ct. 432, 79 L.Ed. 912 (1935); *United States Trust Co. v. New Jersey,* 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). But it is clear that what was missing in cases such as *Sun Oil, Castle,* and *Coast* is the same thing that is missing here—an authorized exercise of the government's power of eminent domain. As the Supreme Court explained in *Omnia Commercial Co. v. United States,* 261

---

**3.** 41 U.S.C. §§ 601–613 (1994).

U.S. 502, 510, 43 S.Ct. 437, 67 L.Ed. 773 (1923), the government is only liable for a taking if it uses its power to appropriate a contract for public use—i.e., if it steps into the shoes of one of the contracting parties. That is not what occurred here. Nor, for that matter, is it even alleged.

 Instead, when the government is a party to the contract, as the *Castle* court noted, the contract "gives rise to the expectation either that the contract will be performed or that the non-breaching party will have available to it a contract-based remedy." 48 Fed.Cl. at 218 (citing *Winstar*, 518 U.S. at 919, 116 S.Ct. 2432 ("Virtually *every* contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: 'The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else.'") (Scalia, J., concurring) (quoting HOLMES, *The Path of the Law* (1897), *in* 3 THE COLLECTED WORKS OF JUSTICE HOLMES 391, 394 (S. Novick ed.1995))).

Plaintiffs, however, cite *Lynch* for the proposition that takings liability is also possible in the contract context, even in the absence of an outright appropriation. The reason there was liability in *Lynch*, however, was because Congress had eliminated altogether a forum for advancing a breach of contract claim. The lack of a remedy there was not a result, as might be the case here, of a failure of proof, but because legislation had closed the door to proof altogether. Here, plaintiffs retain the right to try to establish their contract damages.

Plaintiffs also rely on *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), to bolster their argument that a property interest arose simply from their expectation interest. Plaintiffs argue that, because they assumed millions of dollars of liabilities in reliance on these mergers, defendant cannot upset their investment-backed expectations without compensating them. Plaintiffs in effect assert an estoppel.

Neither *Kaiser Aetna*, nor *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), another case upon which plaintiffs rely, stand for the proposition that expectations, by themselves, are property interests. The significance of "reasonable, investment-backed expectations" in a takings context was identified in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). This interest was part of a larger inquiry into whether government regulatory action rises to the level of a compensable taking. The other elements are the character of the government action and the degree of economic impact. 438 U.S. at 124, 98 S.Ct. 2646. The application of this test, however, presupposes a property interest. In *Penn Central*, it was a building, including the airspace above it. In *Kaiser Aetna*, it consisted of a lagoon and, specifically, the right to exclude others from it. In *Ruckelshaus*, it consisted of trade secrets. All three property interests existed independent of the taking inquiry. Nothing came into existence simply because of a party's investment-backed expectations.

In the present case, the only identifiable property interest is the contract. As discussed above, that property interest was not taken for public use.

Nor can an estoppel theory succeed. Plaintiffs dropped count II, which asserted the illegality of the regulatory capital restrictions flowing from FIRREA, in effect conceding the government's power to act. In any event, the Supreme Court foreclosed any such argument in *Winstar*, when it concluded that nothing about the transactions at issue there "purported to bar the Government from changing the way in which it regulated the thrift industry." 518 U.S. at 868, 116 S.Ct. 2432. As the *Castle* court found, *Winstar* "makes clear that plaintiffs had no entitlement to a specific regulatory treatment as distinguished from the entitlement to damages in the event of regulatory change." 48 Fed.Cl. at 220 (citing *Winstar*, 518 U.S. at 868–70, 116 S.Ct. 2432). Any such entitlement, moreover, was found to be contractual in nature, not the result of an estoppel.

Finally, the lack of a "complete" contract remedy, either because it would not include interest or because the contract theory does not yield a recovery, does not give life to a

takings theory. If the contract remedy does not produce a recovery, it is because the contract did not give a right to a recovery. In the absence of that contract remedy, no other property right is implicated.

The question of interest was addressed in *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed.Cir.2001). There, plaintiff asserted that it was entitled to interest on its damages caused by the government's breach of contract. The Federal Circuit disagreed, observing instead that if, as plaintiff asserted,

> the Government's breach of [a Launch Services Agreement] was a taking under the Fifth Amendment, then nearly all Government contract breaches would give rise to compensation under the Fifth Amendment. This court's predecessor has cautioned against commingling takings compensation and contract damages. Indeed, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights.

271 F.3d at 1070 (quoting *Sun Oil*, 572 F.2d at 818) (citations omitted). Similarly, in *Castle*, plaintiffs argued that if they "recover less than 'just compensation' (*e.g.*, because the court denies lost profits or because contract damages cannot include pre-judgment interest), the Fifth Amendment requires the government to make up the difference." 48 Fed.Cl. at 219. The court disagreed, holding that

> plaintiffs' rule proves too much. If we were to characterize as a taking the failure to award pre-judgment interest on a contract claim, we would essentially invalidate the law's proscription against the allowance of pre-judgment interest when not specified by contract or congressional act. Further, the congressional waiver of sovereign immunity only in those instances where interest is specifically provided for by contract or congressional act means that, in the absence of those circumstances, plaintiffs have no reasonable expectation—and hence no property interest—in the money they might otherwise have earned as interest on an earlier-paid judgment.
>
> Similarly, the court's refusal to award lost profits does not transform plaintiffs' loss into a taking.... the court was not reasonably convinced that profits would have existed, so the failure to award them in no way diminishes the value of plaintiffs' contract rights.

*Id.* at 219–20 (citation omitted).

The recent decision in *Franconia Associates v. United States*, 240 F.3d 1358 (Fed.Cir. 2001), *cert. granted, in part, Grass Valley Terrace v. United States*, —— U.S. ——, 122 S.Ct. 802, 151 L.Ed.2d 688 (2002), does not assist plaintiffs. The claim there is analogous to the present case, in that it was alleged that legislation affecting existing contract rights either affected a breach or a taking. This court and the Federal Circuit both decided the issue based on the lapse of the limitations period. Plaintiffs point to the Federal Circuit's recital that "each appellant's contract prepayment right can be property for Fifth Amendment purposes. The appellants' unfettered right to prepay their FmHA loans at any time was eliminated by ... ELIHPA because ELIHPA prohibited FmHA from allowing unrestricted prepayments.... ELIHPA effected an appropriation of their contract right ...." 240 F.3d at 1365–66. We view this statement, not as an endorsement of the merits of plaintiffs' claim, but merely as a restatement of their allegations in order to anchor the court's finding of untimeliness. It was, at best, dicta.

In sum, plaintiffs' contract rights were not "taken" within the meaning of the Fifth Amendment. Under the present facts, their rights are enforceable through a contract remedy, or not at all.

2. Defendant's Motion for Summary Judgment

■ The only remaining theory of recovery is Ahmanson's claim for the cost of replacement capital. It alleges that to maintain Home's regulatory compliance after FIRREA it was forced to infuse hundreds of millions of dollars in new capital. Plaintiffs concede that only Ahmanson incurred these costs; none were incurred by Home Savings.[4]

Defendant has moved to dismiss the claim on both procedural and substantive grounds. As an initial matter, it argues that Ahmanson has no standing to pursue the claim since it was not a party to the assistance agreement. Because the actual recipient of the assistance agreement (and, hence, the party to the assistance agreement) was Home Savings, defendant contends that the government's promise to treat supervisory goodwill as capital ran only to Home Savings and not to Ahmanson. Thus Ahmanson, in defendant's view, has no right to enforce the promise.[5]

Defendant's motion also addresses the merits of Ahmanson's claim. It contends that plaintiffs' cost of replacing goodwill is limited to transaction costs; that the amount of phased-out goodwill must reflect Home Savings' sale of its acquired thrifts during the 1990s; and that an award of damages may be "grossed up" to account for taxation. The latter three issues are only relevant if Ahmanson can maintain its claim, however.

Ahmanson does not contend that its rights arose because it is a third party beneficiary under the assistance agreements. The real question here is whether a promise to permit supervisory goodwill to be recognized for regulatory compliance purposes ran directly to Ahmanson. The answer to that question in turn depends on whether the only sources of such a promise were the assistance agreements. As defendant points out, the terms of those four agreements narrowly circumscribe the relevant parties: FSLIC and Home Savings. The "Entire Agreement" clauses of all the contracts make it clear that the promises exchanged therein run only to those named entities. The "Sole Benefit" clauses emphasize that limitation.

Rather, Ahmanson contends that it directly became a party to the assistance agreement through the incorporation clause, which states that the agreement is limited to its express terms, other than "any resolutions . . . issued contemporaneously herewith by [FHLBB]." We are not persuaded. The assistance agreements are explicit in terms of who the constituent parties were. These did not include Ahmanson. Whatever the reference to the resolution accomplished by way of additional rights or obligations as between Home Savings and FSLIC, it did not purport to bring in wholly new parties solely to the assistance agreements. It is thus not clear that Ahmanson would be the proper party, for example, to enforce Home Savings' right to insist on contribution of assistance for determined net negative worth. *Accord Cienega Gardens v. United States*, 162 F.3d 1123, 1133 (Fed.Cir.1998) ("While the deed of trust note . . . and the regulatory agreement were part of the same transaction, each document stands alone and is unambiguous on its face. The documents evidence separate agreements between distinct parties.").

Plaintiffs' better argument is that the assistance agreement is only one part of a

---

**4.** Home Savings was not a publicly traded company, and, accordingly, could not issue preferred or common stock to raise capital. Additionally, any capital it could have raised via subordinated debt would not have counted towards meeting its core or tangible capital requirements. *See* 12 C.F.R. §§ 567.5(a), 567.9(b) (1992). Thus, Ahmanson had to raise any capital that Home Savings wished to substitute for supervisory goodwill.

**5.** We find that defendant neither waived nor abandoned the defense of Ahmanson's lack of privity by failing to specifically raise it in its answer. Defendant did raise the defense of lack of standing, which embraces the absence of privity. *See Pacetti v. United States*, 50 Fed.Cl. 239, 244 (2001) ("Only plaintiffs who are in privity of contract with the government can have standing to bring a claim in this court"); *Cal. Sand & Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 24 (1990) ("Absent privity, a party lacks standing to sue; without standing, the court is without jurisdiction to resolve issues raised by that party."). In any event, the issue would be unavoidable in establishing causation in connection with calculating damages.

larger transaction to which Ahmanson was a party—namely, a separate, implied-in-fact agreement with FHLBB at the time Ahmanson sought approval of its acquisitions, through Home Savings, of the target banks. This agreement arguably would have included a promise of continued viability of supervisory goodwill. Plaintiffs argue, with some support, that such a promise is not contingent upon an assistance agreement. Rather, they contend that the promise also had to run directly to Ahmanson in connection with the underlying acquisitions.

We believe plaintiffs have the better of the argument. The Federal Circuit was faced, in *California Federal Bank, FSB v. United States,* 245 F.3d 1342, 1346 (Fed.Cir.2001), with the contention that the lack of an assistance agreement directly incorporating the FHLBB's forbearance letters, comparable to the resolutions here, foreclosed the finding of a promise of a contract for the continued recognition of supervisory goodwill. The court disagreed, concluding that the absence of an assistance agreement was not fatal. Pointing to the Supreme Court's decision in *Winstar,* 518 U.S. at 907–09, 116 S.Ct. 2432, the court held that the entire acquisition process was memorialized in several documents, including the forbearance letters.

The question of whether an investor was in privity with the government was directly addressed in *Bluebonnet Savings Bank, F.S.B. v. United States,* 43 Fed.Cl. 69 (1999). There, the trial court held that, although Mr. Fail, one of the investors, did not sign the assistance agreement, he was a party to the contract nevertheless by virtue of his ownership of the stock of the acquiring holding company and his direct involvement in negotiations. Forbearance letters were addressed to him. The issue of his standing does not seem to have been addressed in a subsequent appeal, *Bluebonnet Savings Bank, F.S.B. v. U.S.,* 266 F.3d 1348 (Fed.Cir.2001), which directed an award to all plaintiffs.[6]

As we held in our earlier opinion in this case, the FHLBB resolutions in this case explicitly recognize Ahmanson as the applicant for approval of the acquisitions of the target banks through its subsidiary, Home Savings. The initiating document, in effect an offer, was Ahmanson's application to the FHLBB for obtaining control of the target banks. FHLBB's response was its resolutions, which reflect certain conditions, including that future support of Home Savings would come from two sources. One was Ahmanson itself, which acknowledged a continuing obligation to maintain the net worth of Home Savings. The Century transaction, for example, is representative of conditions FHLBB imposed on Ahmanson ("Applicant") as part of the merger approval process:

(1) Upon consummation of the Acquisition, Applicant shall file with the FSLIC and the Supervisory Agent a Net Worth Maintenance Stipulation, pursuant to which Applicant stipulates to the FSLIC that, so long as it controls Home Savings, ... it shall cause the net worth of Home Savings to be maintained in compliance with the requirements of § 563.13(b) of the Insurance Regulations, ... and it shall, as necessary, infuse into Home Savings sufficient capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such net worth requirement;

(2) Upon consummation of the Merger, Applicant and Home Savings shall file a Dividend Limitation Stipulation with the Supervisory Agent pursuant to which Applicant and Home Savings stipulate that, so long as Applicant directly or indirectly controls Home Savings, ... Home Savings shall not, and Applicant shall not cause Home Savings to, declare or pay a dividend in any fiscal year that would reduce Home Savings' net worth below the

---

**6.** Also instructive are the facts of the Statesman mergers, reflected in *Winstar Corp. v. United States,* 64 F.3d 1531, 1537 (Fed.Cir.1995). That series of acquisitions also involved as plaintiffs two investors in a holding company. The holding company, also a plaintiff, in turn controlled the newly-formed acquiring bank, which then

merged with the failing thrifts. It is unclear from the factual recitations which parties signed which documents. In substance, however, the transactions, which would appear to be very similar to those in the case at bar, did not prompt the court to draw distinctions between signatory and non-signatory plaintiffs.

level required under § 563.13(b) of the Insurance Regulations for institutions insured 20 years or longer;

(3) Upon consummation of the Merger, Applicant shall file with the Supervisory Agent a Stipulation Restricting Security Brokerage Activities . . . .

Ahmanson did not have to acquire the target banks, but it plainly incurred obligations to prop up Home Savings if it did so.

The other source of support was the government, in the form of assistance agreements and supervisory goodwill. The Century resolution, for example, recognized that "financial assistance by FSLIC is necessary to prevent the default of Century and to facilitate the merger with Home Savings," Ahmanson's subsidiary. It also reflected that in accounting for the acquisition of assets by Home Savings, the thrift would use generally accepted accounting principles and would substantiate its conformity with regulatory requirements for amounts attributable to intangible assets, including goodwill. The resolutions thus reflect mutual, reciprocal obligations by both Ahmanson and the United States to support Home Savings.

Defendant cites *LaSalle Talman Bank, F.S.B. v. United States,* 45 Fed.Cl. 64 (1999), for the proposition that investors are not proper party plaintiffs in enforcing the promise of continued availability of supervisory goodwill. That issue was not addressed in *LaSalle,* however. The entity which eventually injected new capital into the bank was not a party in the case, nor was it the acquirer at the time of the assistance agreements. Ahmanson is both.

Defendant also cites *Glass v. United States,* 258 F.3d 1349 (Fed.Cir.2001), for the proposition that investors are not proper parties to enforce a promise of continued availability of supervisory goodwill. In that case, Sentry Mortgage Corporation acquired a controlling interest in Security Savings Bank, a failing thrift. As part of the approval process of the acquisition, the shareholders of Sentry were required to promise that they would maintain the bank's net worth. In exchange, FHLBB agreed to certain regulatory forbearances, including the recognition of the thrift's supervisory goodwill in main-

taining regulatory capital requirements. Sentry was dissolved as a result of a stock swap, leaving the thrift in the control of Sentry's former shareholders, who brought suit, claiming that FIRREA breached promises made to them.

The trial court held that the shareholders were not parties to the agreement giving Sentry control of Security Bank. *Glass v. United States,* 44 Fed.Cl. 73, 79 (1999). The government's contracting partners were Sentry and Security. The only remaining contract theory open to the Sentry shareholders was that of third party beneficiaries. The trial court found that the shareholders were third party beneficiaries of the government's contract with the thrift they had agreed, if necessary, to capitalize. *Id.* at 79. The Federal Circuit subsequently reversed that holding, however, finding that the shareholders were not the intended direct beneficiaries of the contract. 258 F.3d at 1353–55.

*Glass* is distinguishable. Ahmanson does not merely have shareholder standing. It was an essential participant in each of these acquisition transactions. Indeed, Ahmanson is more akin to the (short-lived) parent of the assisted bank in *Glass,* Sentry. FHLBB negotiated with Ahmanson, which sought to get approval of acquisition of the target banks. And it was Ahmanson that FHLBB recognized as obligating itself, as part of that acquisition, to maintain Home Savings' net worth.

We hold, in sum, that Ahmanson is properly a party plaintiff, in that it contracted with the government in connection with its acquisition, through Home Savings, of the target banks, and that it was assured that Home Savings could utilize supervisory goodwill as regulatory capital.

■ Defendant offers three other bases for finding in its favor in whole or in part on Ahmanson's claim for the cost of replacement capital. We find that none are suitable for summary judgment. Defendant, citing *California Federal,* 245 F.3d at 1350, seeks a ruling that Ahmanson's damages are limited to transaction costs in connection with obtaining replacement capital. The circuit court's opinion on this issue, however, does

no more than affirm the trial court's credibility assessments of the competing experts. *Id.* Neither *California Federal,* nor the other case cited by defendant, *LaSalle Talman,* support a judgment for defendant on this issue as a matter of law.

We are equally reluctant to review at this stage defendant's other contentions—that the amount of phased-out goodwill must reflect Home Savings' sale of nearly all of the acquired thrifts and that an award of damages cannot be "grossed-up" to reflect potential effects of taxation on an award of damages. Both assertions are heavily fact dependent and will be the subject of extensive expert testimony.[7] It would be imprudent at this stage to attempt to rule out plaintiffs' proof as a matter of law.

### CONCLUSION

Plaintiffs' Motion for Leave to File Notice of Supplemental Authority is granted. Defendant's motion to dismiss counts II, III, and IV is granted. Defendant's motion for summary judgment with respect to count I is denied. The parties are directed to file status reports on or before February 6, 2002, proposing further pretrial proceedings.

---

7. Defendant cites *LaSalle Talman* for the proposition that awards can never, as a matter of law, be "grossed-up" to account for the effects of taxation. There, the court commented that the bank cited no authority for the adjustment and that the claim, in any event, failed for lack of proof. By contrast, Ahmanson cites analogous support for such an adjustment and the court has not yet heard its experts defend it on factual grounds. Although the issue is initially one of law, the court declines, without a factual context, to make any categorical rulings at this stage.